# IN THE COURT OF APPEALS OF IOWA

No. 16-1481
Filed January 24, 2018

IN RE THE MARRIAGE OF JOEL D. STENZEL
AND CHERYL A. STENZEL

Upon the Petition of
CHERYL A. STENZEL,
        Petitioner-Appellee,

And Concerning
JOEL D. STENZEL,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Randy V. Hefner,

Judge.


        Joel Stenzel appeals from the spousal support provisions of the decree

dissolving his marriage to Cheryl Stenzel.  **AFFIRMED.**


        James S. Blackburn of Finley Law Firm, P.C., Des Moines, for appellant.

        Anjela A. Shutts and Van T. Everett of Whitfield & Eddy, P.L.C., Des

Moines, for appellee.


        Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**DANILSON, Chief Judge.**

Joel Stenzel appeals from the spousal support provisions of the decree dissolving his thirty-two-year marriage to Cheryl Stenzel. Joel characterizes the support awarded to Cheryl as reimbursement support, which he contends is improper here. He also maintains the statutory language that support should be "at a standard of living reasonably comparable to that enjoyed during the marriage" is not forward looking and, thus, his "current and future earnings should not be a primary focus of the case." Joel asserts the court's consideration of certain of Cheryl's expenses is not allowed under Iowa Code section 598.21A(1).[1] Additionally, Joel objects to the amount of spousal support ordered both before and after retirement, the equalization fee related to attorney fees, and the court's finding that Joel's cosmetic dental costs paid from marital assets should be reimbursed to Cheryl. Finding no failure to do equity in the court's rulings, we affirm.

**I. Background Facts.**

Both parties agreed Cheryl was entitled to permanent spousal support but disagreed as to the amount and duration. At trial, Joel proposed Cheryl receive $3500 per month until he reaches the age of sixty-six;[2] Cheryl asked for $15,000 per month until she reaches the age of sixty-seven and $4000 per month thereafter until the death of either party or her remarriage. The court ordered spousal support in the amount of $12,000 per month, which would decrease to $8000 per month when Joel reached the age of sixty-two (the court found this

---

[1] We will refer to the 2017 Iowa Code as there have been no substantive changes to the pertinent sections since the date of the filing of the petition.
[2] Upon appeal, Joel alleges spousal support should be set at $5083 per month.

age was consistent with Joel's testimony that he anticipated a career change in six or seven years, as well as being consistent with the couple's plan that Joel's move would expedite his retirement). The support would decrease again to $4000 per month when Joel reached the age of full social security retirement (age sixty-seven).

Having thoroughly reviewed the testimony and exhibits, we agree with and adopt the following fact findings of the district court:

> Cheryl and Joel were married on August 11, 1984. Cheryl was [twenty-three] and Joel [twenty-four] years of age. [At the time of trial,] Cheryl [was] [fifty-five] years and Joel [fifty-six] years of age. Neither brought any significant property or debt into the marriage. The parties did not execute a prenuptial agreement.
>
> At the time of the marriage, Joel had just completed his second year of medical school at the University of Iowa. Cheryl entered pharmacy school at the University of Iowa shortly after the marriage. Joel graduated from medical school in 1986. He completed a family medicine residency in Cedar Rapids following medical school, and he completed a residency in pediatrics from 1987–1990 at what is now Blank Children's Hospital in Des Moines. Between 1990–1993, Joel completed a fellowship in neonatology at Texas Children's Hospital in Houston. He returned to Des Moines in 1993 and worked for Newborn Care Consultants. Iowa Methodist Medical Center purchased this practice in approximately 1994 or 1995, and the practice was integrated into Blank Children's Hospital. Joel worked at Blank until early 2013. He then took a position with Newborn Specialists in Tulsa. Joel is board certified in pediatrics and neonatal-perinatal medicine. He is licensed to practice medicine in Oklahoma and Iowa.
>
> Cheryl graduated with a degree in chemistry in 1983 and then attended pharmacy school from 1984–1987. She graduated with a Bachelor of Science degree in pharmacy in 1987. She has been a licensed pharmacist in Iowa since 1987 and is now also licensed in Oklahoma. She does not, however, have a Doctor of Pharmacy degree [(Pharm. D.), which is currently required to become licensed].
>
> Two sons were born to the marriage, both now adults. . . .
>
> Cheryl describes her health as excellent. Joel is in relatively good health, but he testified that he is taking medication for anxiety, depression, and hyperlipidemia. He believes these conditions may

be related to stress associated with his current employment and the dissolution of the marriage.

A basic understanding of the practice of neonatology is necessary to contextualize Joel's contentions. Neonatology is the care of critically ill newborns. By necessity it is hospital-based. Neonatologists cover deliveries as necessary and neonatal intensive care units [NICU's]. Critically ill newborns require round-the-clock care. Neonatologists thus work night and weekend shifts. Some neonatologists are employed by a hospital and are paid a salary, as at Blank, and some neonatologists, such as those at Newborn Specialties, contract with hospitals to provide neonatology services privately and are paid on a service-provided basis.

Four neonatologists served Blank when Joel originally began working there. This number eventually increased to seven. Night, weekend, and day shifts were divided evenly among the physicians. According to Joel, he would work [forty] to [fifty] hours per week, although Cheryl testified that she recalled Joel working substantially more hours while at Blank. He received five weeks of vacation and other benefits.

During the 2005–2006 timeframe, Joel was contacted by Newborn Specialties, a neonatology group in Tulsa, about relocating and joining that practice. Joel and Cheryl traveled to Tulsa, but ultimately decided to remain in Des Moines for personal and family reasons, including the fact that their sons were in private school and they did not wish to relocate them to Tulsa.

Joel was recruited by this group again in 2013. The original group was splitting, and several of the physicians were intending to remain in private practice and serve two area hospitals. They required the services of one or more additional neonatologists to provide adequate coverage.

Until this time, Joel and Cheryl had not planned to leave the Des Moines area. Joel testified that he would "probably" have worked at Blank until his mid-[sixties]. But by 2013, both [sons] had graduated from high school. Joel recognized that the work hours in Tulsa would be substantially greater than at Blank, but he also realized that he would earn substantially more income. Joel and Cheryl discussed the benefits of accepting the Newborn Specialties position and moving to Tulsa. By doing so, they anticipated that Joel's income would increase substantially, but in turn his retirement date would be accelerated. They ultimately decided to make this move.

Joel moved to Tulsa in March of 2013. Cheryl remained in this area at least in part to sell their home in Norwalk where they had lived for [fifteen] years. That house was ultimately sold in July of 2014 for $420,000.

According to Cheryl, in May of 2014, [the couple experienced a breach of trust]. They discussed conditions that

Cheryl imposed in order "to restore the trust in the marriage and to prove to [Cheryl] that [Joel] was committed to [the] marriage." As a result, Cheryl decided not to move to Tulsa but to remain in Iowa. Cheryl filed the petition to dissolve the marriage in May of 2015 when she learned that Joel was involved in a relationship in Tulsa.

The district court also examined the earnings history of the parties.

According to Joel's social security earnings statement, his income at Blank increased from $183,125 in 1994 to $293,676 in 2012. His gross income from 2008–2012, his last five years at Blank, averaged $300,204. Substantial contributions were made into Joel's 401(k) account during this time.

Joel bought a [twenty percent] interest in Newborn Specialties for $150,000 in 2013. This buy-in was financed with a seller note which provided that $30,000 per year would be forgiven. This constitutes reportable income but does not constitute disposable income.

Joel originally agreed to a $350,000 salary at Newborn Specialists plus his proportionate share of profits. This base salary was incrementally increased to its current level of $500,000. His gross earnings in 2013, the year he moved from Blank to Newborn Specialists, totaled $608,811. His earned income in 2014, his first full year with Newborn Specialists, was $677,531 and $529,771 in 2015. These amounts include the annual $30,000 of debt forgiveness, but do not include rental income of $51,157 in 2014 and $34,053 in 2015. They also exclude $23,000–$24,000 of [yearly] contributions to Joel's retirement account. Joel's current income is based upon the $500,000 salary plus periodic profit distributions.

Joel's compensation package includes [a] full panoply of benefits, including family medical insurance, life insurance, a retirement plan with employer contributions, disability insurance, a continuing education allowance, and reimbursement for medical licensure fees. Joel testified that it is not foreseeable that the practice will "slow down" in the near future. Though income may be affected by such variables as Medicaid reimbursement rates, those changes are by their nature unforeseeable. It is probable that Joel's income will remain stable or will increase over at least the next five to six years, and his annual income from all sources will exceed $600,000.

Joel asserts that his increase in income comes at a cost. He is currently working longer hours with less time off than he had at Blank. He testified that he does not believe that he will be physically or mentally capable of maintaining his current work schedule and demands beyond the age of [sixty-one] or [sixty-two].

He testified that he would likely pursue a different career path or retire at that time.

> Joel's testimony regarding his retirement plans was quite clearly affected, not only by the stress of the practice, but also by the stress of this proceeding. Any number of factors will ultimately affect Joel's decision to retire or make a significant career change. For example, the practice could restructure to lessen the burden on the doctors. (The practice is currently hiring more doctors.) Joel may make another career move with unforeseeable financial consequences. All that can be reasonably forecast at this juncture is that Joel's annual income will remain in excess of $600,000 for the next [six] or [seven] years, and that he may reduce his workload by age [sixty-two]. His most likely retirement date based upon this record is [sixty-seven], his social security full retirement age.

In regard to Cheryl's employment and earnings history the district court observed:

> From 1987 until 1990 Cheryl worked full-time at Mercy Hospital in Des Moines, and she continued working full-time after [their first son] was born and until the family moved to Houston.
>
> She worked at Texas Children's Hospital in Houston from 1990–1993 while Joel pursued his neonatology fellowship. After [the younger son] was born in 1992, Cheryl left the work force and earned no income for the years 1993–1995. She returned to work part-time for Medicap in 1996 when [the younger child] began preschool. She worked for Dahl's part-time from 2007–2014. She left that employment in anticipation of the move to Tulsa. Dahl's went out of business, and she accepted a position as an on-call pharmacist for Target in late 2014. She worked there for approximately one year. She then took a part-time position with DGS Foods, LLC, under its trade names of Price Chopper and Cash Saver, primarily to secure more consistent hours and reduce travel.
>
> Cheryl is working approximately [thirty] hours per week, including every other weekend, earning $48.25 per hour. She receives no benefits. She is entitled to participate in the company's 401(k) retirement plan, but she is not entitled to an employer contribution. Health insurance, and perhaps other benefits, may be available to her if she works more than [thirty-two] hours per week, but her ability to increase her hours is speculative.
>
> From 1984, the year the parties were married, until 2006, Cheryl's highest annual income was $30,283. During that timeframe, she earned in excess of $30,000 in only two of those years—1988 and 1989. Her income at Dahl's from 2010–2013 ranged from $44,674 to $73,277.

Cheryl testified that she could earn $90,000 to $100,000 per year if she could find full-time employment working [forty-two]–[forty-four] hours per week. Cheryl has applied for full[-]time pharmacy positions in the Des Moines area but has not been successful. Her employability is limited to some extent by modification of entry-level education requirements or expectations for pharmacists [(a Pharm. D.)]. Though Cheryl has a valid pharmacist license in Iowa, her education is less than that required of more recent pharmacy graduates . . . . Her ability to find full-time employment is also limited, in her opinion, by her age.

Cheryl's current plan is to stay at her present position. She admitted that this decision is in part based upon personal considerations. She prefers to retain some flexibility to travel and see her sons.

Based upon Cheryl's age, education, experience, and health, it is reasonable to conclude that her earning capacity is $75,000 per year.

Cheryl was also entrusted with many responsibilities of the family and home. The district court noted, "As a result of Joel's schedule, Cheryl was also primarily responsible for managing the household and caring for the children throughout the marriage. She was responsible for everything from managing the family finances, getting the boys to school, overseeing homework, shopping, laundry, cooking and cleaning."

The parties also presented evidence of their standard of living during their marriage. In this regard the court stated,

Joel and Cheryl both described their standard of living during their marriage as "comfortable" or "very comfortable." They did not own an extravagant residence, as evidenced by the 2014 sale price of their home. They would typically take two family vacations per year and traveled to such destinations as Hawaii, Cayman Islands, Australia, Cancun, Europe, New York City, and San Francisco. Neither have expensive hobbies.

Both [their sons] attended elementary school at Des Moines Christian School, and [the older son] graduated from high school there. They paid private school tuition for both sons. [The older son] attended a private university, Bethel University in St. Paul, and Joel and Cheryl paid his college expenses. They also paid for [the

[younger son]'s undergraduate education at the University of Michigan at a cost of approximately $50,000 per year.

The parties regularly made substantial charitable contributions. They reported deductible charitable gifts on their 2012 tax return in the amount of $23,247; $29,310 in 2013; $42,830 in 2014; and $39,431 in 2015.

The district court also elaborated upon the parties' current living expenses and lifestyle while this action was pending.

Cheryl submitted a summary of current or reasonably anticipated monthly expenses with her revised financial affidavit. This summary estimates Cheryl's monthly living expenses at $17,510. These expenses appear generally reasonable. Cheryl anticipates attempting to save $5878 per month toward retirement. Her anticipated monthly living expenses would be approximately $11,632 exclusive of retirement savings.

Joel also submitted a summary of actual or anticipated living expenses with his financial affidavit. His summary also appears reasonable. Joel estimated that his monthly living expenses, actual or anticipated, would total $6669. Joel currently has a roommate and at least some of the expenses shown in his affidavit would be shared. Joel does not estimate the amount he would save toward retirement, but this may be in part due to the fact that he is contributing $3834 per month toward his retirement account by payroll deduction.

Both parties are living in apartments. Neither is living extravagantly. Since the separation, both parties have traveled. These trips were not inconsistent with their pre-separation lifestyle. Their respective post-dissolution budgets reflect lifestyles which only approximate that enjoyed during the marriage.

With respect to the property division, the district court noted the parties "managed their finances prudently" and were able to

finance their sons' educations, contribute generously to their charities, save for retirement, live within their means, and avoid debt. They accomplished these goals.

Cheryl submitted a statement of requested relief, which included a proposed division of assets and debts. Joel did not dispute the valuations reflected in that exhibit. He did object to Cheryl's proposed division because, according to him, her proposed division would result in a disproportionate award of cash assets to Cheryl.

According to exhibit 151, the parties' net worth is approximately $1,422,683, a portion of which Cheryl claims as inherited or otherwise separate property. The parties agree that the marital assets and debts should be divided equally, and thus each party will leave the marriage with approximately $638,971 of marital assets. As particularly pertinent to the spousal support issue, under her proposal, Cheryl's assets would include approximately $230,000 available for her immediate needs. Joel conversely would have less cash available for his immediate support, but his income will continue to be substantially greater than Cheryl's. The assets he will be awarded will include the estimated value of his share of Newborn Specialists, LLC, and Newborn Specialists of Tulsa, PC, totaling approximately $282,000, a value that is not disputed.

(Footnotes omitted.)

The trial court considered the relevant factors of section 598.21A(1), noted Cheryl's "contributions and sacrifices which substantially enhanced Joel's career at the expense of Cheryl's career," Cheryl's need "to increase her income to achieve the pre-dissolution standard of living," and Joel's "substantial ability to pay." The court found "Joel's current income and earning capacity from Newborn Specialties is clearly relevant in determining what support Joel would have provided Cheryl had the marriage continued." The district court concluded Cheryl's earning capacity was $75,000 per year and her monthly living expenses "necessary to maintain her reasonably comfortable standard of living, but exclusive of retirement savings" were $12,000 per month. The court then found Joel was able to pay $144,000 per year in support and still have "a conservatively estimated $456,000 per year" in income—which the court found "more than sufficient to maintain or improve his standard of living and to continue making substantial contributions into his retirement accounts."

Joel appeals.

**II. Scope and Standard of Review.**

Dissolution proceedings are tried in equity, and our review is therefore de novo. Iowa Code § 598.3; *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the fact findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). "[W]e accord the trial court considerable latitude in making this determination [of spousal support] and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (citation omitted); *accord Mauer*, 874 N.W.2d at 104.

**III. Discussion.**

We begin by noting that types of spousal support—whether categorized as traditional, rehabilitative or reimbursement—are not mutually exclusive. *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015). In fact, as we have stated, the moniker is nothing more than a "red herring." *Id.* And "there is nothing in our case law that requires us, or any other court in this state, to award only one type of support" or to "characterize the support award as purely" one form or another. *In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008). Rather, "[w]hat we are required to do is consider the factors mandated by the legislature contained in section [598.21A] when considering a spousal support award." *Id.* We conclude Joel's harangue about the district court's use of the term "reimburse" is much ado about nothing.

To determine a spousal support award, "Iowa courts 'are compelled to follow the traditional multifactor statutory framework set' forth in Iowa Code

section 598.21A." *Mauer*, 874 N.W.2d at 107 (citation omitted). Under Iowa Code section 598.21A(1), a court

> may grant an order requiring support payments . . . for a limited or indefinite length of time after considering all of the following:
> (a) The length of the marriage.
> (b) The age and physical and emotional health of the parties.
> (c) The distribution of property made pursuant to section 598.21.
> (d) The educational level of each party at the time of marriage and at the time the action is commenced.
> (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> (f) The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> (g) The tax consequences to each party.
> (h) Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> (i) The provisions of an antenuptial agreement.
> (j) Other factors the court may determine to be relevant in an individual case.

After quoting this statutory language of section 598.21A(1), the supreme court recently stated:

> Our cases applying the statute have identified three kinds of support: traditional, rehabilitative, and reimbursement. While the categories may overlap in some cases, this case involves traditional spousal support. "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). Traditional support is ordinarily of unlimited or indefinite duration.

*In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015) (internal citations omitted).

Joel strenuously argues the Iowa courts should specifically disavow the language from *Hettinga* and *Gust* concerning the purpose of traditional alimony being "to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued," claiming it misstates the law to be applied. Instead, Joel contends our analysis should be on the need for the spousal support and not the ability to pay because there is no division of future earnings.[3] We agree there is no division of future earnings and perhaps the reference in *Hettinga* and *Gust* to "if the marriage continued" was a poor choice of words, but the point is simply to attempt to provide for a continuation of lifestyle enjoyed during the marriage. We acknowledge we are required to consider all of the criteria set forth in section 598.21A(1). *See Mauer*, 874 N.W.2d at 107.

As noted in *Gust*, 858 N.W.2d at 407, the statutory framework provided by the legislature in 1970 when it enacted no-fault divorce "largely adopted" the criteria enunciated in *Schantz v. Schantz*, 163 N.W.2d 398, 405 (Iowa 1968).[4]

---

[3] "Reimbursement alimony" has been defined as alimony that "allows the spouse receiving the support to share in the other spouse's future earnings in exchange for the receiving spouse's contributions to the source of that income." *Becker*, 756 N.W.2d at 826.

[4] *Schantz* states:

Use of the following general formula may be helpful in arriving at an equitable determination of financial or property rights and obligations of the parties to a divorce action, though each element is not always present or important.

A. PREMARITAL CRITERIA:
1. Social position and living standards of each party.
2. Their respective ages.
3. Their respective mental or physical condition.
4. What each sacrificed or contributed, financially or otherwise, to the marriage.
5. The training, education and abilities of each party.

B. POSTMARITAL CRITERIA:

As stated in *Schantz*, the enunciated factors were pertinent to the "equitable determination in dissolution proceedings." 163 N.W.2d at 405.

Section 598.21A(1)(f) identifies one of the factors to consider and requires us to consider the past standard of living of the parties, i.e., "The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal." There is no analysis in *Hettinga* or *Gust* to suggest the court had a new or different interpretation of this factor. We also find no inherent inconsistency between the stated purpose of traditional support in long-term marriages as set out in *Hettinga* and *Gust* and the statutory factors to be considered in determining an equitable amount of such support. *See* Iowa Code § 598.21A(1). We are guided by the statutory words—"the standard of living . . . during the marriage" and are required to impose support so the payee's standard of living during the marriage may be continued. The standard does not change simply because the payor's income or financial condition improves after

1. Duration of the marriage.
2. Number of children, their respective ages, physical or mental conditions, and relative parental as opposed to financial needs.
3. Net worth of property acquired, contributions of each party thereto by labor or otherwise, net worth and present income of each party.
4. Conduct of the spouses and particularly that of the guilty party.
5. Present physical and mental health of each party.
6. Earning capacity of each party.
7. Life expectancy of each party.
8. Any extraordinary sacrifice, devotion or care by either spouse in furtherance of a happy marriage or in preservation of the marital relationship.
9. Present standards of living and ability of one party to pay balanced against relative needs of the other.
10. Any other relevant factors which will aid in reaching a fair and equitable determination as to respective rights and obligations of the parties.

163 N.W.2d at 405.

the parties separate or after the marriage. This standard of living during the marriage sets the highest level of spousal support but this sum must then be adjusted by the payee's income or earning capacity, whichever is greater. *See Gust* 858 N.W.2d at 411 ("In determining need, we focus on the earning capability of the spouses, not necessarily on actual income."). Iowa cases "emphasize that in marriages of relatively long duration"—and all agree this thirty-two-year marriage is of long duration—the imposition of and length of an award of traditional spousal support is "primarily predicated" on need and the ability to pay. *Id.*; *see also In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998) ("The imposition and length of an award of traditional alimony is primarily predicated on need and ability.").

Although we consider the past standard of living, some future projections are necessary to determine needs. For example, a spouse may need to procure health insurance after the marriage is dissolved, and it will be necessary to determine the cost of health insurance post-dissolution. In *Mauer*, the court provided this analysis:

> To determine how much income Carol would require to support herself at a standard of living reasonably comparable to that she enjoyed during the marriage, we begin with the budget Carol provided to the district court. Carol acknowledged the budget was essentially an estimate of historical expenditures for the entire family before the dissolution. Because it included past expenditures Carol was no longer obligated to pay at the time of the trial, *the budget was an inaccurate basis for projecting her post-dissolution support needs*. After adjusting the budget to eliminate every inaccuracy pointed out by the district court, to remove child-specific items that could be paid for using child support, and to appropriately reduce the cost of food, clothing, travel, and household supplies, we find Carol requires approximately $13,000 per month, or approximately $156,000 per year, to enjoy a standard

> of living approaching that she enjoyed during her marriage to Richard.
>
> In determining how much spousal support Carol requires to support herself at that standard of living, we must also consider the tax consequences. Like employment income and investment income, spousal support is taxable. Assuming an effective tax rate of twenty-five percent, Carol requires approximately $208,000 in pretax income from her employment, her investments, and spousal support. Thus, because we find Carol can generate approximately $57,000 in pretax income per year through her employment and her investments, we conclude she requires approximately $151,000 in spousal support annually to maintain a standard of living reasonably comparable to that she enjoyed during the marriage. This equates to $12,583.33 per month. Richard's substantial income from his ophthalmology practice is more than adequate to support this award. Accordingly, we determine $12,600 per month constitutes an equitable spousal support award in this case.

874 N.W.2d at 111 (emphasis added) (citation omitted). Thus, the *Mauer* court acknowledged a spousal support award is to be based on post-dissolution expenses to arrive at an amount that permits the spouse to maintain the past lifestyle. *Id.*

"Often in marriage dissolutions, incomes that were adequate to support married couples and their children are stretched precariously thin in order to cover the expense of maintaining two separate households." *In re Marriage of Florke*, 270 N.W.2d 643, 645 (Iowa 1978). Moreover, if the same standard of living cannot be maintained, support should not be fixed at the cost of the standard of living of the payor. *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa 1983). Ideally, the support should be fixed so the continuation of both parties' standard of living can continue, if possible. *See In re Marriage of Bornstein*, 359 N.W.2d 500, 502 (Iowa Ct. App. 1984). We turn to the disputed issue of the amount of support Cheryl needs.

With respect to Cheryl's needs to maintain her standard of living, we observe the district court did consider the "feasibility" of Cheryl becoming self-supporting at a similar level of comfort and concluded spousal support was required. *See* Iowa Code § 598.21A(1)(f). We agree with the trial court that Cheryl's earnings will likely not ever increase such that she will become capable of earning enough to maintain a comparable standard of living to that she enjoyed during her marriage to Joel.

Cheryl contends that she needs $17,510 per month to maintain her lifestyle. Joel takes exception to several items listed in Cheryl's budget. Joel contends Cheryl's list of expenses include current and anticipated expenses and are not reflective of the pre-divorce lifestyle. Specifically, Joel contests Cheryl's budget items of $1200 per month for charitable donations, $500 per month for retirement savings, and $375 per month for gifts. Joel notes Cheryl also listed $208 for household maintenance and $183 for miscellaneous household costs so she has no need for additional savings. She also lists $1000 per month for travel so there is no need for savings for travel. Joel also challenges the entry for mortgage payments of $2200 per month for a fifteen-year mortgage with a loan of $250,000. He argues that, in essence, she will be receiving another $250,000 in assets by this request. He suggests Cheryl should be obligated to pay the principal with her own assets and her housing expense entry should only reflect the interest of $811 per month. Cheryl contends these budget items will allow her the opportunity to continue with what had been the parties' marital goals: contribute generously to charities, save for retirement, live within her means, and avoid debt.

In his brief, Joel asserts spousal support in the amount of $5083 per month is sufficient to provide Cheryl the "standard of living reasonably comparable to that enjoyed during the marriage." *See* Iowa Code § 598.21A(1)(f). But the statutory phrase modifies the subject of the provision: "The feasibility of the party seeking maintenance of becoming self-supporting . . . ." *Id.* We have already found that Cheryl's earnings likely will not ever increase such that she will become capable of earning enough to maintain a comparable standard of living to that she enjoyed during her marriage to Joel.

We agree with Cheryl's recitation of the marital goals as the record reflects the parties paid over $20,000 in charitable donations in each of the past four years and transferred over $20,000 per year into their retirement account. Unfortunately, there appears no Iowa case addressing whether the needs of a spouse may include substantial monies for charitable donations or retirement savings. In the past, a spouse's need for alimony has only included a modest amount for such expenses. *See In re Marriage of Perry*, No. 01-0057, 2001 WL 1448496, at *4 (Iowa Ct. App. Nov. 16, 2001) (finding a former spouse was entitled to more than nominal alimony notwithstanding her voluntary choice to save for retirement and make small donations to church).[5]

The issue of donations and retirement savings has been addressed in only a few cases in other states. Our review of those cases suggests that the resolution of the issue is dependent upon whether support is statutorily to be set to meet only basic needs or to the station in life to which the spouse was

---

[5] We also observe that in *Mauer*, 874 N.W.2d at 111, miscellaneous expenses were reduced or eliminated from the spouse's listed needs, but no reference was made to the $500 monthly savings or the $83 per month in charitable donations.

accustomed. *Compare In re Marriage of J.M.R. & K.L.R.*, CN12–03967, 2013 WL 8181480, at *18 (Del. Fam. Ct. July 29, 2013) ("[I]t is not a reasonable need to give money away, and the court will not award [the spouse] alimony . . . so she can give it away."), and *Launey v. Launey*, 722 So. 2d 406, 409 (La. Ct. App. 1998) (finding charitable donations were not necessities) *with Butler v. Butler*, 684 S.E.2d 191, 197-98 (S.C. 2009) (finding donations were a proper expense "when the parties established a certain standard of living during their marriage"), *Dobson v. Dobson*, 294 P.3d 591, 598-99 (Utah Ct. App. 2012) (finding gifts and donations may be proper "if the payor spouse's resources are adequate, alimony should not be limited to provide for only basic needs, but should also consider the recipient spouse's 'station in life'" (citation omitted)), and *In re Marriage of Schmitt*, 626 N.W.2d 14, 19 (Wis. Ct. App. 2001) (concluding it was proper to consider generous charitable donations as a part of a spouse's standard of living).

In *Baranowski v. Barnowski*, 80 P.3d 153, 156 (Utah Ct. App. 2003), the court stated,

> While the recipient spouse's need to fund post-divorce savings, investment, or retirement accounts may not ordinarily be factored into an alimony determination, we cannot say that the ability to fund such post-divorce accounts may never be taken into account as part of a needs analysis. The critical question is whether funds for post-divorce savings, investment, and retirement accounts are necessary because contributing to such accounts was standard practice during the marriage and helped to form the couple's marital standard of living. The inclusion of savings deposits as part of the needs analysis in an alimony determination is allowed only under such circumstances.

*See also Tobler v. Tobler*, 337 P.3d 296, 303 (Utah Ct. App. 2014) (affirming an allowance of savings expenses because "the parties regularly saved during the

marriage, and it is reasonable for [the former spouse] to continue saving consistent with the parties' married lifestyle").

Because section 598.21A(1)(f) requires us to consider the past standard of living of the parties, and not just basic needs or necessities, we conclude—as have other courts with a similar statutory standard—that charitable donations and retirement savings in a reasonable sum may be a part of the needs analysis in fixing spousal support. Here, we have no difficulty with Cheryl's expense item of $500 for retirement savings in light of the parties significant past history of preserving assets for retirement. However, we find her level of charitable donations significantly higher than the standard set for the parties as a married couple. For example, during the years of 2010 to 2012, their donations averaged about 6.5% of their gross income for two people.

Cheryl's expense of $1200 per month for charitable donations would constitute almost the same percentage for a single person. Accordingly, we find the amount of $500 a more proper sum in light of past standard of living.

We are unable to conclude that Cheryl's expense for gifts of $375 per month is unreasonable.

With regard to the expense for the home mortgage, we note this is an estimate. We presume the sum of $2200 per month expense would include principal, interest, and property taxes because Cheryl has not otherwise identified property taxes as an expense. Because she will be leaving the marriage with approximately $230,000 in liquid assets, Cheryl has some ability to pay, but both parties are leaving the marriage with significant assets. It is not equitable to limit housing expense to just the interest on the mortgage. Cheryl

will have interest, principal, and property taxes to pay should she choose to purchase a residence and finance it as planned. Under the circumstances we believe it is equitable for her to reflect $2200 per month for her housing expense.

Cheryl has net monthly income of $4485. She identified total monthly expenses of $17,510. The district court did not allow for the full amount of Cheryl's request for $5878 per month toward retirement. While Cheryl's sum for expenses could be reduced to provide for $500 per month for charitable donations, in determining the proper amount of spousal support we are also required to consider the tax consequences. *See Mauer*, 874 N.W.2d at 111. Alimony payments will be taxable to Cheryl. *See In re Marriage of Anliker*, 694 N.W.2d 535, 542 (Iowa 2005). Because it quite clear her additional income taxes on the alimony payments will exceed $500 and Cheryl has not appealed the amount of alimony awarded to her by the district court of $12,000 per month, we conclude alimony should be fixed at that amount subject to Joel's ability to pay that sum.

With respect to Joel's ability to pay Cheryl's unmet expenses, he contends his current income—which is approximately double that which he earned at Blank—should not be considered. While it is to Joel's advantage that we not consider his current income, the court's task is to consider the "ability to pay." *See Gust*, 858 N.W.2d at 411. Thus, even if Cheryl has not grown accustomed to a lifestyle with Joel's higher income, Joel's ability to pay is determined by his current income, not his historically lower income. The district court found Joel's income is likely to stay at more than $600,000 for the next several years. Joel does not contest that finding.

We agree with the district court that Joel is quite able to pay $144,000 per year in spousal support and still have more than $456,000 remaining. He will also benefit by the tax deduction permitted for alimony payments. *See* 26 U.S.C. § 215.

Joel next contends the district court "awarded far too much in retirement spousal support." He states, "There is no mathematical way to come up with an award of retirement alimony." But Joel acknowledges the support is determined based on each case's particular circumstances. *See Gust*, 858 N.W.2d at 408. He suggests $1000 per month is "generous." We disagree. We believe the trial court has adequately explained and equitably provided for Joel's plan to accelerate his retirement from neonatology while allowing Cheryl support in decreasing amounts. We find no failure to do equity.

We do not address Joel's challenge to the attorney fee equalization payment because the issue was first raised in a late-filed posttrial motion.[6] *See*

---

[6] The decree was filed on July 14, 2016. Iowa rules of civil procedure then in effect require motions to amend or enlarge to be filed within fifteen days of the decree. *See* Iowa Rs. Civ. P. 1.904(2), 1.1007. The court had ruled on the parties' timely motions on August 10, 2016, and that ruling had nothing to do with the attorney fee equalization payment.

Joel raised this issue for the first time in a second motion to enlarge or amend, which was filed on August 23, 2016. This late-filed motion did not preserve his claim of error. "The timeliness of posttrial motions and appeal is a matter of jurisdiction and is not subject to waiver in Iowa." *State ex rel. Miller v. Santa Rosa Sales & Mktg., Inc.*, 475 N.W.2d 210, 214 (Iowa 1991), *superseded by statute on other grounds as stated in State v. Hagen*, 840 N.W.2d 140, 152 (Iowa 2013).

In his reply brief, Joel argues Cheryl's preservation-of-error argument avoids his contention. He does not, however, assert he ever brought the issue to the district court in a timely fashion.

We note rule 1.904 has recently been amended and now specifically addresses such successive motions:

> (2) *Motion to reconsider, enlarge, or amend.* On motion joined with or filed within the time allowed for a motion for new trial, the findings and conclusions may be reconsidered, enlarged, or amended and the judgment or decree modified accordingly or a different judgment or

*State v. Halliburton*, 539 N.W.2d 339, 343 (Iowa 1995) (holding a party is to make an objection at the "earliest opportunity after the grounds for the objection become apparent" in order to preserve error). Thus, Joel has not preserved error on this issue.

As for Joel's contention that the record supports a finding that his dental work was not a dissipation of marital assets, we are not inclined to make any modification of the court's distribution of assets. Although the dental work was recommended by his dentist, Joel admitted his insurance company classified the dental work as cosmetic. Without more, we are unable to conclude the dental work was a necessary family expense. Considering the statutory factors, Cheryl's need, and Joel's ability to pay, we find no failure to do equity here. We therefore affirm.

Cheryl seeks an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative

---

decree substituted. Resistances to such motions and replies may be filed and supporting briefs may be served as provided in rules 1.431(4) and 1.431(5).

(3) *Motions to reconsider, enlarge, or amend other court orders, rulings, judgments, or decrees; time for filing.* In addition to proceedings encompassed by rule 1.904(1), a rule 1.904(2) motion to reconsider, enlarge, or amend another court order, ruling, judgment, or decree will be considered timely if filed within 15 days after the filing of the order, judgment, or decree to which it is directed.

(4) *Successive rule 1.904(2) motions.* Successive rule 1.904(2) motions by a party are prohibited unless the court has modified its order, ruling, judgment, or decree and the subsequent rule 1.904(2) motion is directed only at the modification.

merits of the appeal.'" *Id.* (*quoting In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)). While Cheryl has had to defend the trial court's rulings, we conclude each party has the means to pay their own appellate attorney fees.

Costs of the appeal shall be taxed to Joel.

**AFFIRMED.**