# IN THE COURT OF APPEALS OF IOWA

No. 24-1379
Filed August 6, 2025

IN RE THE MARRIAGE OF TODD LYNN ERNST
AND STACEY ANN ERNST

Upon the Petition of
TODD LYNN ERNST,
      Petitioner-Appellee,

And Concerning
STACEY ANN ERNST,
      Respondent-Appellant.

_____

Appeal from the Iowa District Court for Sac County, Ashley Sparks, Judge.

A former spouse appeals provisions of decree of dissolution of marriage pertaining to the spousal-support award. **AFFIRMED AS MODIFIED.**

Vicki R. Copeland of Copeland Law Firm, P.L.L.C., Jefferson, for appellant.

Lisa K. Mazurek of Law Office of Lisa K. Mazurek P.L.C., Cherokee, for appellee.

Considered without oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**GREER, Presiding Judge.**

Todd and Stacey Ernst were married thirty-five years before separating in 2023. The district court divided their marital assets and property, which are not in dispute, and fixed a traditional spousal support payment that Stacey argues did not take into account all of Todd's annual earnings or her monthly expenses and set her annual income too high. Neither party condones the district court's method for calculating spousal support. But Todd contends that while the method was unorthodox, the actual determination of the amount was equitable. Both parties ask for an award of appellate attorney fees.

After our review, we conclude the district court failed to consider Todd's actual base income. Additionally, while anticipated future bonuses could be considered to establish Todd's ability to pay, they could not be used to fund the spousal-support obligation. Given those issues, the spousal-support award was not equitable and minimized the needs of Stacey to continue the marital standard of living. On our de novo review, we modify and increase Stacey's monthly spousal support award to $3862. We award Stacey appellate attorney fees of $7500.

## I. Background Facts and Proceedings.

Todd and Stacey were married in 1988, when Stacey was a senior in college and Todd was a recent graduate. With no assets to their name, the couple started as "broke college kids" and then transitioned into full-time wage earnings. Todd entered the marriage with college loans, which the couple jointly paid off, and Stacey was debt-free. Stacey worked in customer service and banking until around 2013. Todd originally worked in the insurance industry as an adjuster but left the field because of the stress. For the first twenty-three years of their

marriage, until around 2011, Stacey was the primary breadwinner, which allowed Todd to leave his stressful insurance job and work for less money. Ultimately when the couple moved to be closer to family in 1997, Todd joined a company called V-T Industries. When Stacey eventually left her position with a bank after an acquisition, she also joined V-T Industries. Once Stacey left the banking industry, Todd became the higher wage earner. In the last fifteen years, Stacey's income steadied while Todd's income rose sharply. According to 2023 tax records, Stacey reported yearly wages of $49,983 while Todd reported $140,102.[1] But in the three years before 2023, Todd's earnings hovered just over $100,000.

Todd's earnings reflected several increases that came as a result of two promotions in 2023. The first occurred in January 2023, when Todd was given a conditional promotion to Director of Inventory Control and Procurement, with a base salary of $134,117.94. That base salary again increased in November to $147,529.75, when he took the position without conditional status. As a result of these promotions, Todd was allocated two bonuses, one for $55,000 and the second $55,028, but the actual 2023 bonus paid was $110,974. In 2024, Todd again received an increase in base earnings—this time to $162,545.76. Along with the additional raise in base earnings, the bonus system was modified so that Todd's target bonus would be 30% of his base wage ($48,763.75) with a maximum bonus potential of 175% the target bonus ($85,336.53).[2] Conservatively, Todd's

---

[1] These numbers are shown on the tax return and from their W-2's after allowable deductions against income.

[2] The new bonus offer noted:

> The Target Bonus and the Maximum Bonus are based on team members scoring 100% on their Performance Review. Team members scoring *more* than 100% on their Performance Review are

total earnings for 2024 would be approximately $211,309, or gross monthly income of $17,609, which is what Todd reflected as his gross income on his filed affidavit of financial status.

While not earning as much as Todd, the district court attributed $56,773.90 as Stacey's income as of the trial date, which included overtime worked. As the wage exhibits admitted at trial showed, as an hourly employee, Stacey had minimal overtime income that increased her salary of $52,353.60 ($25.17 per hour). Stacey contended her overtime was not guaranteed but admitted she had received between $1500 to $1700 in overtime income each of the two years before trial.

The couple separated in May 2023. Since that time, Todd lived in a rental townhome and Stacey remained in the marital home, which she wanted to keep. Stacey petitioned for temporary support in February 2024, and the parties agreed to a support payment of $2500 a month and $30,000 lump sum, which was half of the after-tax value of Todd's bonus. Todd was to continue paying real estate taxes and homeowner's insurance, and he paid the registration fee on Stacey's vehicle. The parties proceeded to trial on July 9, 2024, and the district court filed its decree of dissolution of marriage on July 30. After dividing the assets and debts of the parties, the district court ordered Stacey to pay Todd an equalization payment of $204,144.24.[3]  To resolve the spousal-support issue, the district court required Todd to pay Stacey spousal support of $2600 a month plus 50% of any future

eligible for Bonus amounts greater than those referenced above, and team members scoring *less* than 100% on their Performance Review will have their Bonus adjusted accordingly.

[3] With the equalization payment, each party received $643,224 in net assets.

gross annual bonus that is $15,000 or less, for a maximum annual lump sum payment of $7500.

Stacey filed a motion to reconsider or amend and enlarge findings, arguing the district court failed to equitably fix spousal support, which the district court denied. Stacey appeals the district court's determination of spousal support and requests appellate attorney fees. Todd has also requested that Stacey pay his appellate attorney fees.

## II.  Standard of Review.

Our review of spousal support awards is de novo. *See In re Marriage of Mann*, 943 N.W.2d 15, 18 (Iowa 2020). "An appellate court should disturb the district court's determination of spousal support only where there has been a failure to do equity." *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023) (cleaned up). "We give weight to the factual determinations made by the district court; however, their findings are not binding upon this court." *Mann*, 943 N.W.2d at 18 (cleaned up).

## III.  Discussion.

We first address the spousal-support award and then the requests from each party for an award of appellate attorney fees and costs.

*A.  Spousal Support Award.*

Stacey argues the district court's determination of spousal support was not adequate to support her standard of living and that the district court underestimated Todd's base income and expected bonus. She also contends the district court should not have considered overtime in her earning capacity. Todd disputes her contention that the district court's award was inequitable.

Here, the parties agreed that Stacey should receive traditional spousal support under Iowa Code section 598.21A (2023), given that Stacey and Todd were married thirty-five years before they divorced. *See In re Marriage of Stenzel*, 908 N.W.2d 524, 533 (Iowa Ct. App. 2018) ("Iowa cases 'emphasize that in marriages of relatively long duration'—and all agree this thirty-two-year marriage is of long duration—the imposition of and length of an award of traditional spousal support is 'primarily predicated' on need and the ability to pay." (citation omitted)). Stacey has likely reached her maximum earning capacity, which is significantly less than Todd's. *See In re Marriage of Pazhoor*, 971 N.W.2d 530, 543 (Iowa 2022) ("We focus on the earning capacity of the spouses, not their actual income. With respect to ability to pay, we have noted that following a marriage of long duration, we have affirmed awards both of alimony and substantially equal property distribution, especially where the disparity in earning capacity has been great." (cleaned up)). Here, the district court found that "based on the facts of this case," an equal division of property was warranted. And, in that division, Stacey received no assets that produce income, except for retirement accounts for later use. *See In re Marriage of Schenkelberg*, 824 N.W.2d 481, 487 (Iowa 2012) (awarding spousal support when "[wife] was fifty-seven years old at the time of the dissolution. She received no assets that will produce a significant stream of income to keep her in the lifestyle she had become accustomed to while married to [husband]"). Instead, the property division added to Stacey's monthly debt obligations.

So, to determine if the spousal-support award is appropriate, we look at Todd's ability to pay and Stacey's need for support. "The imposition and length of

an award of traditional [spousal support] is primarily predicated on need and ability." *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998) (en banc). Traditional spousal support "is normally payable until the death of either party, the payee's remarriage, or until the dependent is capable of self-support at the lifestyle to which the party was accustomed during the marriage." *Pazhoor*, 971 N.W.2d at 543 (citation omitted).

*1. Ability to Pay.*

Starting with Todd's ability to pay, the district court stated that "Todd's current income is more complex given his base wage and salary" and "more complicated given his bonuses." To navigate around that concern and to arrive at the amount of spousal support awarded, the district court ran a calculation using the income and bonus averages for Todd and the income and overtime estimate of $56,773.90 for Stacey:

> If the parties' annual incomes are added together, it results in a household income of $175,716.20 [Toddy's salary of $103,255.40 + Todd's bonus of $15,686.90 + Stacy's salary of $56,773.90] or $14,643.02 per month. The difference in incomes between Todd and Stacey is $62,168.40 per year or $5,180.70 per month. To even out the monthly income of the parties, Todd would have to pay Stacey $2,590.35 per month in spousal support (Stacey's monthly income $4,731.16 (+) Todd's monthly income $9,911.86 (=) household monthly income $14,643.02; household monthly income $14,643.02 (*) 50% (=) $7,231.51; Todd's monthly income $9,911.86 (-) half of household monthly income $7,231.51 (=) spousal support offset $2,590.35). Based on this information, the Court finds it fair to set the base spousal support award at $2,600.00 per month (or $31,200.00 per year).[4]

---

[4] If the actual earning potential of Todd was factored into this same formula, the spousal support obligation would be $6,438.95 to equalize the gross household monthly income.

To arrive at the base wage, the district court looked back at the base wage income from 2015 through 2024 and used the average wage of $103,255.40 in the "ability to pay" consideration. But the evidence at trial confirmed that Todd's base earnings have steadily increased and were $162,545.76 annually at the time of the dissolution trial. There was no reason to average the wages to address his ability to pay spousal support. Plus, the district court was "not persuaded by Todd's argument that a bonus [was] unlikely given the consistency of his bonuses and his recent promotions." Yet the district court did the same thing with the bonuses, excluding the full amount of the 2023 bonus of $100,974[5] and averaging several years of smaller bonuses, arriving at an average bonus of $15,686.90. Using past, smaller bonuses to come up with an average was inequitable under these facts because with Todd's new role as a director starting in 2023, the bonus structure results in a larger target bonus, with even greater potential should the metric be met. So, we find including the lower bonuses paid prior to 2023 is not equitable, yet we agree that the bonus of $100,974 is an outlier that should also not be considered.

The formula employed by the district court did not address the factors that are essential to setting the spousal-support obligation. "The legislature has not authorized Iowa courts to employ any fixed or mathematical formula in applying spousal support." *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016).

---

[5] The district court reduced this larger 2023 bonus to $48,763, the target bonus for 2024, but it did not remove from the bonus calculation the small bonus of $2048 due to COVID-19 issues that appeared to be an outlier on the low side.

Instead, without a prescriptive formula, courts must make determinations of spousal support with the criteria listed in section 598.21A(1):

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other factors the court may determine to be relevant in an individual case.

The court considers "*all*" factors in section 598.21A when determining the equitable amount of spousal support, *Schenkelberg*, 824 N.W.2d at 486, and "the various factors . . . cannot be considered in isolation from each other," *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015).

Spousal support is not intended as an equalization of income payment; spousal support is intended to "maintain a standard of living reasonably comparable to that . . . enjoyed in the marriage." *In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008); *see also In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997) ("The purpose of a traditional or permanent [spousal support] award is to provide the receiving spouse with support comparable to what

he or she would receive if the marriage continued."). "The standard does not change simply because the payor's income or financial condition improves after the parties separate or after the marriage is dissolved. This standard of living during the marriage sets the highest level of spousal support . . . ." *Stenzel*, 908 N.W.2d at 533.

While we consider the current base salary in the ability-to-pay analysis, other than two notable outliers in Todd's bonus history, $2048 in 2022 (before promotion) and $100,974 in 2024 (after promotion), Todd's bonuses since his promotion were established by documentation from the company. And, contrary to Todd's testimony that the bonuses were not guaranteed, the company set those targets, which Todd had met in his new role. With Todd's substantial increase in income, we think the average of his base wages and bonuses over the past ten years is a poor metric for determining his ability to pay for the purposes of spousal support. Instead, we think Todd's most recent base income, $162,546, with an expected bonus of $48,764, the low end of his target bonus range, for a total of $211,310, is most representative of Todd's earning potential.[6]

As to the difference in earnings from time of trial compared to pre-separation, Todd argues that the future increases in his earnings are irrelevant "as long as Stacey's support at the standard of living she enjoyed during the marriage is satisfied." We agree, but we clarify that once the standard-of-living expense is established, the earning capacity of the payor must be taken into account to

---

[6] In an exhibit admitted at trial, Todd used the current base salary and his target bonus to reflect the impact of spousal support. He showed the calculations both using the bonus and excluding the bonus.

determine what is equitable for both parties. *See id.* Here, Todd can support both his marital standard of living and supplement Stacey's at the pre-separation standard.

The court found Stacey was entitled to a portion of Todd's bonus as "the parties enjoyed Todd's bonus for many years" and the bonus will "provide some potential for additional support" for Stacey. Plus, we take into account the fact that Stacey supported Todd when he needed to leave a better paying, more stressful job early in the marriage. So while we consider his minimum future bonuses as part of his annual salary for the purposes of determining the appropriate spousal support, we disagree with the district court's decision to award a percentage of future bonuses in addition to the monthly spousal-support payment. *See In re Marriage of Hayne,* 334 N.W.2d 347, 351 (Iowa 1983) (en banc) (noting it was against "public policy" to award anticipated future income as spousal support). Thus, we reevaluate what funds are necessary to support Stacey's standard of living enjoyed during the marriage.

*2. Need for Support.*

We pivot to Stacey's ability to maintain her standard of living that she enjoyed during the marriage. We look to her June 2024 paystub information, which the district court used to calculate her 2024 annual income, finding that Stacey was likely to earn $56,774, or a net income of $3793 per month. There was no evidence of a pattern of other overtime being paid except for approximately $1500 in 2023. Stacey testified that overtime was not guaranteed and she could not rely on it for budgeting purposes. But Stacey did testify if there was a lookback over the last five years, there might be a "variation" in her income because of overtime. Thus,

we use the earning capacity established by the district court. "It is appropriate to exclude overtime income only if it is uncertain or speculative. History over recent years is the best test of whether certain payments are expected or speculative." *In re Marriage of Withers*, No. 03-0753, 2004 WL 434128, at *4 (Iowa Ct. App. Mar. 10, 2004) (internal citation omitted).

Next, we turn to Stacey's need for spousal support while factoring in her earning capacity to support her standard of living. To determine an appropriate spousal-support award, we start by determining the costs of Stacey's standard of living within the marriage. As the court in *Stenzel* noted:

> "Often in marriage dissolutions, incomes that were adequate to support married couples . . . are stretched precariously thin in order to cover the expense of maintaining two separate households." Moreover, if the same standard of living cannot be maintained, support should not be fixed at the cost of the standard of living of the payor. Ideally, the support should be fixed so the continuation of both parties' standard of living can continue, if possible.

908 N.W.2d at 534 (internal citations omitted). The district court noted that portions of the parties' submitted expenses from their filed financial status affidavits were inflated. Todd points to Stacey's estimation of her energy bill, which was significantly greater than her most recent energy bills (Stacey claimed she had not been running the air conditioner to save money); her newly added mowing and snow removal services she did not have during the marriage; and the fact she no longer rents a storage unit yet still included the expense. The district court estimated that Stacey's expenses were more likely in the $5000 to $6000 range rather than the average of $7333 she claimed each month. We generally give deference to the district court's credibility assessments. *See In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007) ("Although our review is de novo, we

ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence.").

But here, Todd filed a financial affidavit that—on appeal he claims—included his expenses "based on his projected budget requirement to reattain the standard of living that he was enjoying during the marriage" with a total outlay of more than $7976 each month.[7]  Those expenses included a mortgage payment of $1900 for a $200,000 home he would be purchasing.  Stacey's reported expenses totaled approximately $7333 per month but did not reflect the court-ordered requirement that she pay Todd a lump-sum payment of $204,144.24.  Financing this lump-sum payment would require an additional mortgage payment of $1900 on top of the $700 per month she already owed her mother, for a total mortgage payment of $2,600 each month.[8]  As a comparison, the district court correctly noted that the 2022 joint net taxable income of the parties was approximately $120,000, meaning the parties only had about $10,000 per month to spend; the range of expenses for each post-separation should only be $5000–6000 per month.  But that suggests that the marital standard of living should be reduced by half.  And, while separation of the couple does often leave less for each to spend than if they

---

[7] While Todd's expense list included a monthly payment to their adult daughter of more than $1000 that was set to sunset soon, we note that the parties had supported their daughters at various times during the marriage.  Stacey testified Todd was still financially able to do so while she would be limited in making gifts of that nature to their adult children post-dissolution.

[8] Both parties signed a mortgage note with Stacey's parents that required interest-free payments of $700 per month until paid in full.  The balance of the note at the time of trial was $26,100, which—assuming normal payments—would not be paid off for approximately thirty-eight months.

were a joint unit, here the $10,000 per month standard of living can be supported, which complies with the statute.

With the view that they had $10,000 to spend, we observe that the couple did not leave the marriage with much by way of savings, suggesting they spent what they made. As a married couple, Todd and Stacey took vacations and were members of a country club. While they described themselves as frugal, it is reasonable to assume their standard of living would not be half of what they spent as a couple. As a result, for our analysis, we accept that the reported expenses might be inflated but because the parties both reported similar monthly expenses of $7333.33 and $7976, we accept that range as defining the marital standard of living. In doing so, we note that Stacey did not include many specific expenses, such as a clothing allowance or the payment she will now add to her mortgage obligation, so we split the difference between the parties' reported estimates and use $7655 per month as Stacey's standard of living during the marriage, just short of what Todd reported.

The district court determined that Stacey's need could be met with a spousal support payment of $2600 per month plus "50% of the gross of any bonus that is $15,000.00 or less (maximum $7,500.00 annually)." Thus, if the bonuses pan out, Stacey could expect spousal support of $3,225 per month ($2600 + $625). Because we remove the requirement that future bonuses be paid in addition to the monthly spousal-support award, we modify the decree to require Todd to pay

$3,862 per month ($7655 − $3793[9]) with the conditions imposed by the district court that the obligation will continue until Stacey dies, remarries, or cohabitates.

*B. Attorney Fees.*

"In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016) (citation omitted). Stacey was successful in her appeal, and Todd has a better financial ability to pay the fees. Thus, we find that Todd shall pay the sum of $7500 towards Stacey's requested appellate attorney fees of $15,342.50 and decline to award Todd any of his requested attorney fees of $7575.

**IV. Conclusion**.

We modify the decision of the district court to provide that Todd shall pay Stacey spousal support of $3862 per month. We also award Stacey appellate attorney fees of $7500.

**AFFIRMED AS MODIFIED.**

---

[9] Stacey's net monthly income, without spousal support, as calculated by Todd in his exhibit setting out spousal support options.