# IN THE COURT OF APPEALS OF IOWA

No. 21-0172
Filed January 27, 2022

IN RE THE MARRIAGE OF JEFFREY N. MEINTS
AND CRYSTAL K. MEINTS

Upon the Petition of
JEFFREY N. MEINTS,
        Petitioner-Appellee,

And Concerning
CRYSTAL K. MEINTS,
        Respondent-Appellant.

_____

Appeal from the Iowa District Court for Cerro Gordo County, Gregg R. Rosenbladt, Judge.

Crystal Meints appeals the decree dissolving her marriage to Jeffrey Meints. **AFFIRMED AS MODIFIED.**

Brian J. Humke and Logan J. Eliasen of Nyemaster Goode, P.C., Ames, for appellant.

Anjela Shutts and Anna E. Mallen of Whitfield and Eddy, P.L.C., Des Moines, for appellee.

Considered by Schumacher, P.J., Ahlers, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**MULLINS, Senior Judge.**

Crystal Meints appeals the decree dissolving her marriage to Jeffrey Meints (Jeff).  She argues (1) the court's property distribution is inequitable for various reasons, (2) the court erred in not concluding Jeff dissipated marital assets, (3) the court's award of spousal support in her favor was inadequate, and (4) the court's award of trial attorney fees in her favor was insufficient.  Crystal requests an award of appellate attorney fees.

**I.     Background**

The parties married in 1989.  Each party had children from prior relationships—Jeff two and Crystal one—and the marriage itself produced two more children.  All of the parties' children reached the age of majority prior to the proceedings.

At the time of trial, Jeff was fifty-five years old and in good health.  He is a high school graduate but only attended one semester of college.  Jeff runs a seed and chemical business, Titan Pro SCI (Titan Pro),[1] and also farms with Crystal's son, Derek, under a farming corporation, Otter Creek Holdings (Otter Creek).[2]  Jeff is the founder of Titan Pro and has been its CEO since its inception in 2009.[3]  His

---

[1] Titan Pro is owned by Jeff and his four biological children, all of whom are employed by the business.  In 2017, Titan pro was appraised at a value of $4,870,000.00.  Thereafter, Jeff sold each of the four children 10% of the company's stock, leaving him with a controlling 60%.  The children did not pay for the shares, but each executed a loan agreement and promissory note in favor of Jeff in the amount of $365,300.00 with annual interest payments and a balloon payment in 2026.  Crystal testified she was not consulted about the sale of Titan Pro stock to the children.

[2] Jeff began farming in the 1980s.

[3] Titan Pro's predecessor entity was Farm Advantage, which Jeff started with two partners in 1990.  The business was dissolved in 2008.  At the time, only one other

annual base salary is $230,000.00. He has received additional compensation based on commissions in the past, but he testified "[t]hat has dwindled over the years because [he] don't do much of that anymore and so that's basically nonexistent." He is eligible for annual bonuses based on certain criteria and profitability. He received a $20,000.00 bonus for fiscal year 2019 but did not expect to receive a bonus for fiscal year 2020. His compensation package also includes a vehicle and health and life insurance. According to Jeff's affidavit of financial status, his gross monthly income, including from Titan Pro and "real estate rental," amounts to $40,481.75, resulting in an annual gross income of $485,781.00.

Crystal was also fifty-five at the time of trial. She had recently had her thyroid removed, and she has some knee and back issues. A biopsy showed her thyroid was cancerous, and she will be on thyroid medication the rest of her life. She needs back surgery at some point, which will involve three or four months of recovery. She testified she also suffers from depression, anxiety, and post-traumatic stress disorder. After completing high school in 1983, she attended some college and then entered the workforce. Beginning in 1986, before the parties were married, Crystal was employed by the local sheriff's department as a dispatcher and jailer. She continued this employment and other odd jobs while Jeff farmed. Crystal discontinued working in 2003. She testified, thereafter, "I was stay-at-home." At some point, she began working for Titan Pro, "help[ing] out wherever anything was needed," "from cleaning toilets to cooking to . . . planning." Crystal testified Jeff did not want her to work anywhere else "because then [she]

---

partner remained with Jeff, and Jeff learned the partner was "skimming money off the top of the business."

wouldn't be able to be where he needed [her] to be." She received a salary and benefits. Over time, her duties decreased, and she discontinued working at Titan Pro in 2018, when the company's CFO recommended against her continued employment due to potential liabilities relating to financial auditing. According to her financial affidavit, Crystal's gross annual income from leasing agricultural ground and interest income is $37,907.00. She claimed her total monthly expenses amounted to $24,478.00.

The parties obtained several pieces of property during the marriage that have been used for farming by Otter Creek. Of the properties, several are titled in Crystal's name alone, which Otter Creek paid her cash rent to farm.[4] Of the properties in Crystal's name, Jeff requested he be awarded the Butson farm, where corn bins owned by him and Derek are located; the east half of Harold's farm[5]; and thirty acres in Franklin County. Jeff testified such an award would provide enough farm ground to justify the ongoing farming operations of Otter Creek. Crystal requested she be awarded the Butson farm because it generates income and "is [her] retirement," but she stated she would be willing to survey off the bin sites on the property for purchase by Otter Creek. She agreed it would make most sense for Jeff to own the entirety of Harold's farm and testified she would allow Jeff to buy her portion of Harold's farm for its appraised value.

---

[4] This appears to have been a tactic to shield Crystal's property from potential risk relating to Jeff's business ventures.

[5] Harold's farm was previously owned jointly by the parties. They partitioned the property and placed the east half in Crystal's trust and the west half in Jeff's trust. Jeff testified both portions need tile work and, because Crystal's share is between Jeff's share and other farming property owned by Jeff and tile work needs to run through all three properties, it would make most sense for both halves to be awarded to him.

Ultimately, Jeff vacated the marital home and petitioned for dissolution of the parties' marriage in April 2019. Thereafter, Jeff lived in a warehouse leased by Titan Pro. He lived there until February 1, 2020, when he moved into a lake house. At that point, he could not purchase the lake house because of the ongoing dissolution proceeding, but he began renting it from the owners with a plan to put the rent money toward purchasing it in the future. Jeff entered into a rental agreement to rent the home for $10,000.00 per month, and a purchase agreement to buy the home, furnishings, and associated watercrafts for $1,200,000.00. He began renting the home and paid a $10,000.00 deposit. Shortly thereafter, the seller offered to reduce the purchase price by $100,000.00 if Jeff could find someone else to purchase the property during the pendency of the dissolution. The parties' son, Kyle, agreed to obtain financing and purchased the home. In the ensuing months, Jeff paid the sellers $20,000.00 worth of rent, and Kyle purchased the home for $1,070,000.00. The $10,000.00 deposit and $20,000.00 in rent were forfeited to the sellers. While the purchase agreement between Kyle and the sellers noted appliances and furniture as included in the sale, it did not mention the watercrafts as included with the sale. However, Kyle testified "it was a take-all buy," including the watercrafts and dock, and he received those items with the sale. Also, after the sale, the watercrafts were titled in Jeff's girlfriend's name. Kyle testified he did not want the watercrafts titled in his name for liability purposes. The district court specifically concluded the watercrafts were included with the sale to Kyle, with which we agree. Jeff continued renting the home from Kyle for $10,000.00 per month up to the time of trial in September 2020. Kyle testified Jeff

is not going to get credit for the rent payments he has made if and when he purchases the home from Kyle.

After Titan Pro became profitable, the parties lived a luxurious lifestyle. They vacationed frequently, bought what they wanted, and did not worry about money. Since the parties' separation, each of them has spent money on or for the benefit of their new significant other.

The dissolution trial was held over three days in September 2020. As to Crystal's claim that Jeff's rental of the lake house amounted to dissipation of assets, the court concluded, "Given the length of time that [Jeff] avoided spending money by living [in a warehouse], . . . the steep rent he paid for several months is understandable, and the court does not consider that a dissipation of assets." The court highlighted the facts that trial was originally to be held around the time Jeff began renting the home in February 2020, it was continued to April at Crystal's request, and then further delayed due to the ongoing COVID-19 pandemic.

The court recognized the division of agricultural real property was complicated. Based on the unique situation, the court found that to "divide up the ground farmed by [Jeff] and/or Otter Creek would lead to several disruptions, as the properties are farmed as a whole." Recognizing that public policy and caselaw "favor preserving family farming operations," the court concluded providing Crystal with compensation in the form of a larger property settlement instead of dividing the farmland did equity between the parties.

Considering the factors contained in Iowa Code section 598.21A(1) (2020), the court awarded Crystal monthly spousal support in the amount of $3000.00 for fifteen years. As to the division of property, the court generally adopted Jeff's

requested relief, which resulted in net assets of around $9.5 million to Jeff and $2 million to Crystal. For equalization, the court ordered Jeff to pay Crystal an equalization payment of $3,967,516.00, payable in twenty annual installments of $198,376.00 at the legal interest rate of 2.12%. The court awarded Crystal $10,000.00 in trial attorney fees.

In her ensuing motion to reconsider, enlarge, or amend, Crystal, in relevant part, asked to be awarded funds attributable to various state and federal tax refunds and half of a stimulus check, claimed Jeff concealed the watercrafts associated with the lake house as marital assets, challenged the court's division of real property, argued the duration of the property equalization payment schedule was inequitable, requested a lien on Jeff's stock to secure the equalization award, reprised her allegations of asset dissipation, and asserted her awards of spousal support and trial and expert fees were inadequate. Crystal appealed following the court's denial of her motion.[6]

## II.    Standard of Review

Appellate review of dissolution proceedings is de novo. Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

---

[6] The court filed a separate order granting portions of the motion not resisted by Jeff.

**III.    Analysis**

A.      Property Distribution

Crystal argues the court's property distribution was inequitable for several reasons: (1) the court awarded "Jeff nearly all of the income-producing property," (2) "the court's valuation of marital assets lacked a factual basis," (3) "the court failed to account for a number of marital assets," (4) "the amount of time over which the district court stretched the equalization payment is" excessive, and (5) the court declined to require security for the equalization award.  We address each issue in turn.

*1.      Income-producing property*

The court awarded Jeff all the business entities and several tracts of agricultural land.  Crystal highlights the real estate properties she was awarded "do not serve as a feasible income source for" her and the court mischaracterized Jeff's farming operation as "typical Iowa family farming."  She claims the farms she argues she should have been awarded yield $52,824.00 in income, she should be awarded those farms, and her equalization payment should be reduced by $2,121,193.82.[7]

Crystal's equalization award was $3,967,516.00, to be paid in twenty annual installments of $198,376.00, plus interest of 2.12% of the remaining balance.  She also argues that the property distribution and the equalization payments as ordered require her to effectively finance Jeff's farming operation, while reducing her ability

---

[7] We are unsure how Crystal arrives at this figure.  She does not specifically challenge the final valuations by the district court, so we use them as our own.  The farms were valued at $1,679,850.00, $360,000.00, and $259,000.00, with a mortgage of $148,684.00 on the first, resulting in net assets of $2,150,166.00.

to earn money from those assets.[8] But we note her complaint she would lose income of $52,824.00 on $2,121,193.82 of assets is a loss of a 2.49% return on investment, only 0.37% more than the judgment interest.

We find the district court's resolution of the distribution of the challenged property equitable and affirm on this point.

2. *Valuation*

Crystal complains, "In distributing the couple's property, the district court adopted in whole Jeff's valuation of the assets, with the exception of his valuation of the marital home." She only specifically challenges the court's valuation of the "promissory notes from his children for the purchase of Titan Pro SCI stock at $1,401,200.00" and claims the correct value was $1,436,200.00.

The evidence on the balance of the notes was certainly dicey. The promissory notes for each of the four children were for $365,300.00. There was evidence that each have paid Jeff $15,000.00 in principal, which would result in a balance for each child of $350,300.00 and a total outstanding of $1,401,200.00, in line with the district court's valuation. In support of her argument, Crystal only cites her affidavit of financial status, which claims three of the children owed the $350,300.00, while the fourth owed $385,300.00, which would come to a total of $1,436,200.00. We find the tacking on of an additional $35,000.00 for the fourth child in the affidavit without explanation on appeal or supported by the evidence below to be insufficient to overturn the valuation by the district court. While the evidence was somewhat dicey, the court's valuation was within the range of

---

[8] We address this issue later in this opinion.

evidence, so we decline to disturb it.  *See In re Marriage of Keener*, 728 N.W.2d 188, 194 (Iowa 2007).

> ### 3.     Other assets

Crystal argues "the court failed to account for a number of marital assets when dividing the marital property"—(1) the rental deposit Jeff paid for the lake house, (2) tax refunds and stimulus funds, and (3) boats and watercraft relating to the purchase of the lake house.

As to the rental deposit, we find it more appropriate to address Crystal's complaint as it relates to her claim of dissipation of assets in conjunction with Jeff's rental of the lake house, below, as the evidence shows the deposit was forfeited to the sellers.  As to the tax refunds, Jeff testified all of the refunds had been received except the Iowa state refund, the refunds were placed in a First Citizens checking account, and that account was used for marital expenses.  To the extent those funds could not be directly traced to marital expenses, the court distributed the account to which they were deposited, which defeats Crystal's claim the court failed to distribute them.  But the Iowa refund had yet to be received or deposited into the account that was distributed, so we agree Crystal should be awarded half of that specific refund as part of the equitable distribution.  We modify the decree to require Jeff to pay Crystal one-half of the Iowa tax refund within thirty days of its receipt or issuance of procedendo, whichever is later.  As to the stimulus check, Jeff had received it by the time of trial, and an exhibit shows it was received by direct deposit into one of the accounts of the marital estate, so it has already been included in the division of the parties' assets.  Finally, as to the watercrafts, we find they are not marital assets, as they were obtained by Kyle as part of his purchase

of the lake house and were never titled in Jeff's name. While they may come to Jeff in the future as part of his potential purchase of the lake house from Kyle following dissolution, that possibility does not transform them to marital assets in the present.

### 4. Duration of equalization payment

Crystal argues the court's decision to grant Jeff's request to span his equalization over twenty years instead of her request for a ten-year duration inequitable. She claims there was no basis for the twenty-year duration and the court provided no explanation for its decision.

True, as Crystal points out, Jeff was awarded "[m]ost of the income-producing assets." But he was also assigned most of the debt. Jeff argues that the district court's distribution scheme contemplating equalization over twenty years will "allow Crystal to live comfortably, maintain the properties she was awarded, and still allow Crystal to invest and accumulate other assets." The court's scheme provides Crystal with annual cash flow through her mid-seventies in the neighborhood of $200,000.00, plus interest at the rate of 2.12%. Limiting the duration to ten years, as she has requested we order, would essentially double her annual payment, but only for ten years. It would also reduce Jeff's disposable income, and could frustrate Jeff's ability to maintain a lifestyle close to that which he enjoyed during the marriage. We understand the rationale of the district court that spanning the equalization payment over twenty years minimizes the disparity between the parties as to their ability to maintain a lifestyle similar to that they enjoyed during the marriage over an extended period—twenty years—as opposed

to allowing Crystal a far greater ability for the next ten years, and then the table presumably turning in favor of Jeff upon satisfaction.

But we see a problem. Under the district court's order, Jeff gets the use of nearly $4 million of assets for twenty years,[9] at an interest cost of 2.12%, presumably much less than the return on investment Jeff expects to receive from the value of the assets to which the court determined Crystal was entitled. And, while the annual payments would provide Crystal cash flow that will more than sustain her lifestyle, that arrangement requires that she consume at least part of the principal value of the assets—which is exactly what Jeff argues she can and will likely do—on living expenses, but will be insufficient to fund replacement of the nearly $4 million to which the district and we determine she is entitled as an equalization payment. Furthermore, we believe it is inequitable to require her to wait until she is in her mid-seventies to receive her final property distribution payment.

If, on the other hand, we grant Crystal's request to order the equalization payments to be spread over ten years, she would have enough cash flow—nearly $400,000 per year, plus interest—to sustain her lifestyle while at the same time invest sufficient funds to accumulate substantial assets, income producing or otherwise. The apparent dilemma such distribution would have on putting a crunch of Jeff's cash flow is one of Jeff's making. He wants the assets to maintain the vitality of the farming operation so he can remain profitable, and he requested a

---

[9] They would both be about seventy-five years old by the time the payments are concluded, if paid as ordered.

payment plan. If not for the payment plan, he would have to transfer almost $4 million of assets to Crystal and would lose all use of those assets.[10]

In balance, we determine Crystal's request that the equalization order be modified to a ten-year payment schedule is equitable, and modify the decree to provide that the equalization shall be paid over a period of ten years, in the amount $396,751.60 per year for the period of ten years. All other terms of the judgment not expressly modified herein remain as previously ordered.

### 5. Security for equalization award

Crystal argues "the district court failed to do equity in declining to grant security for the property equalization award." She requests the imposition of "a UCC lien upon Jeff's stock to secure her interest in the property equalization award." She claims this is appropriate because a "judgement lien is insufficient to secure [her] interest in Jeff's stock or the promissory notes" and she "has no recourse if Jeff sells or liquidates those assets." She desires "a UCC lien upon Jeff's Titan Pro SCI stock as well as an accelerator clause in accordance with" *Keener*, 728 N.W.2d at 196.

While "liens may be created when the predicate conditions for a judgment lien do not exist," "[u]nder Iowa Code section 624.23[(1)], judgments are automatic liens against real estate owned by the judgment debtor." *Keener*, 728 N.W.2d at 196. Here, the district court's decree satisfied the requirements for a judgment lien, providing a final judgment for a sum certain, and not incrementally as it

---

[10] While we recognize the reasonable goals Jeff and the district court stated for keeping the farm assets together, our primary goal is an equitable distribution. *See* Iowa Code § 598.21(5).

became due. *See id.* The judgment lien is statutorily provided for ten years, the period over which the equalization payments are ordered to be paid in this opinion. We determine such lien is sufficient under the circumstances of this case.

The only authority Crystal cites in support of her request for an acceleration clause is the *Keener* decision which imposed an acceleration clause in connection with a UCC lien. *See id.* at 198. We have concluded a UCC lien on Jeff's Titan Pro SCI stock should not be granted here, and we decline her request for an acceleration clause.

B.      Dissipation of Assets

Crystal argues Jeff began dissipating marital assets after the parties' separation—renting a home for $10,000.00 per month beginning in February 2020, and spending $5452.00 on travel and entertainment with his girlfriend. Based on this, she argues her "equalization payment should be increased . . . to account for the dissipation."

Our discussion of Crystal's claim relating to the lake house requires the following analysis:

> If the record sufficiently establishes the evidentiary basis for the expense, the court . . . asks whether that purpose amounts to dissipation under the circumstances. A court identifies dissipation by utilizing the following factors:
> > (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the joint marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*In re Marriage of Kimbro*, 826 N.W.2d 696, 701 (Iowa 2013) (altered for readability).

The parties separated and Jeff vacated the marital home in April 2019. Trial was set for February 2020. In January 2020, Crystal moved for a continuance of trial, and Jeff filed a resistance. The court granted Crystal's motion, and then trial was further delayed due to the pandemic. Jeff rode out the time between separation and petitioning for dissolution until the time originally set for trial living in a warehouse and bathing at his gym. It was only after trial was continued that he began renting the lake house. As to whether the expenditure was typical, Crystal herself testified the parties did not worry about money and basically did what they wanted. True, the expenditure benefited only Jeff but, while the amount of the expenditure is on the higher end, Jeff needed a home. While Crystal characterizes the home as lavish and extravagant, that is balanced out by Jeff's willingness to deal with the adversities of living in a warehouse for nearly a year. We agree with the district court this does not amount to dissipation under the circumstances.

As to her claim of dissipation relating to Jeff's travel and entertainment with his girlfriend, Crystal ignores the fact that she also used marital assets in the neighborhood of $7500.00 to pay for a vacation for herself and her significant other. While she claimed in her testimony the man paid for his portion in cash, we find her testimony on this point less than credible and unsupported by any other evidence. So even if Jeff spent money on travel and entertainment with his girlfriend, no inequity resulted to Crystal, because she did the same thing.

C.     Spousal Support

At trial, Crystal requested monthly spousal support of $9000.00 until either party's death or remarriage. The court awarded her monthly spousal support of $3000.00 for fifteen years, which Crystal argues is inadequate.[11]

"[W]e accord the trial court considerable latitude in making th[e] determination [of spousal support] and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Stenzel*, 908 N.W.2d 524, 531 (Iowa Ct. App. 2018) (first and third alterations in original) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005)). Courts may grant an award of spousal support in a dissolution proceeding for a limited or indefinite length of time after considering all of the following relevant factors:

> (a) The length of the marriage.
> (b) The age and physical and emotional health of the parties.
> (c) The distribution of property made pursuant to section 598.21.
> (d) The educational level of each party at the time of marriage and at the time the action is commenced.
> (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> (f) The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> (g) The tax consequences to each party.
> (h) Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> . . . .
> (j) Other factors the court may determine to be relevant in an individual case.

---

[11] Jeff did not appeal from the spousal support order, but argues against Crystal's request for more in this appeal.

Iowa Code § 598.21A(1).

We proceed to the statutory factors. The length of the marriage, exceeding thirty years, is beyond the twenty-year durational threshold warranting an award of traditional support. *See* Iowa Code § 598.21A(1)(a); *Gust*, 858 N.W.2d 402, 410–11 (Iowa 2015). Jeff is generally healthy, but Crystal suffers from physical, mental, and emotional afflictions, and her physical ailments will be a financial burden in the future, especially when she has to obtain private health insurance. *See* Iowa Code § 598.21A(1)(b). We find the distribution of property to be relatively equal and equitable, and the division provides Crystal with an abundance of financial support for the foreseeable future. *See id.* § 598.21A(1)(c). The parties' educational level is relatively equal, although Jeff's ongoing farming and business ventures have undoubtedly been continuing learning experiences and Crystal's absence from the job market has not. *See id.* § 598.21A(1)(d). Jeff clearly has a much higher earning capacity, given Crystal's absence from the job market and health issues. *See id.* § 598.21A(1)(e). Following the success of Titan Pro, the parties did not worry about money and spent such freely. *See id.* § 598.21A(1)(f). Recent changes in federal income tax laws will result in spousal support payments by Jeff not being tax deductible, and the payments received by Crystal will not be taxable. *See In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020); *see also* Iowa Code § 598.21A(1)(g).

The imposition of a spousal-support obligation is largely predicated on the need of the receiving spouse and the paying spouse's ability to pay. *See Gust*, 858 N.W.2d at 411; *see also* Iowa Code § 598.21A(1)(e), (f). "[T]he yardstick for determining need [is] the ability of a spouse to become self-sufficient at 'a standard

of living reasonably comparable to that enjoyed during the marriage.'" *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 598.21A(1)(f)). We agree with the district court that spousal support is appropriate, so we turn to the amount and duration of the award. Upon our de novo review of the record and consideration of the factors contained in section 598.21A(1), we agree with the amount imposed by the district court, $3000 per month, but we modify the decree to provide Jeff's obligation will continue until either party's death or Crystal's remarriage.

D. Trial Attorney and Expert Fees

Crystal submits she had attorney fees nearing $75,000.00 and expert fees totaling around $72,000.00. The court awarded her $10,000.00 in total fees. Crystal argues the award was inadequate and requests the award be increased to $50,000.00.

"A court may consider expert fees in an award of attorney fees." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 488 (Iowa 2012). We review rulings on attorney and expert fees for an abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). This is our most deferential standard of review. *See State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017). "Trial courts have considerable discretion in awarding attorney fees." *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003) (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)). "An award of attorney fees is based on the parties' respective needs and ability to pay." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 867 (Iowa Ct. App. 1996).

This was an expensive proceeding. What we do know is the district court found Jeff's experts more credible and helpful in assisting the court value the

various marital assets, and Crystal does not meaningfully challenge that assessment. Due to the nature of the parties' assets, neither walked away with much for liquid assets when considering the totality of the marital estate. Based on the property distribution, we find the district court's award to be in line with Crystal's need and Jeff's ability to pay and affirm.

### E. Appellate Attorney Fees

Crystal also requests an award of appellate attorney fees, highlighting her "limited means of income and significant costs associated with medical treatment," the duration of the equalization award, and Jeff's ability to pay. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* Crystal's request for appellate attorney fees is not accompanied by a specific amount, an affidavit of fees, or an itemization. In any event, based on the foregoing factors, we decline her request for an award of appellate attorney fees.

## IV. Conclusion

We affirm the district court's distribution of property and challenged valuations. We reject Crystal's claims the court failed to distribute some assets, but we modify the decree to require Jeff to pay Crystal one-half of the Iowa state tax refund. We determine Crystal's request that the equalization order be modified to a ten-year payment schedule is equitable and modify the decree accordingly. We affirm the district court's refusal to grant security for the equalization award,

and we decline Crystal's request for an acceleration clause relating to the equalization payment. We reject Crystal's claims of dissipation of assets by Jeff. We affirm the amount of spousal support awarded by the district court, $3000.00 per month, but we modify the decree to provide Jeff's obligation will continue until either party's death or Crystal's remarriage. We affirm the district court's ruling on Crystal's request for trial and expert fees, and we decline Crystal's request for appellate attorney fees. Costs on appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED.**