**IN THE COURT OF APPEALS OF IOWA**

No. 23-0864
Filed June 19, 2024

**IN RE THE MARRIAGE OF BRIDGET WORD
AND BRETT WORD**

**Upon the Petition of
BRIDGET WORD, n/k/a BRIDGET GRADY,**
      Petitioner-Appellant,

**And Concerning
BRETT WORD,**
      Respondent-Appellee.
_____

      Appeal from the Iowa District Court for Cerro Gordo County, Gregg

Rosenbladt, Judge.


      Bridget Grady appeals the district court's denial of her petition to modify the

parties' dissolution decree.  **AFFIRMED.**


      Sarah A. Reindl of Reindl Law Firm, PLC, Mason City, for appellant.

      Nellie D. O'Mara of O'Mara Law Office, PLLC, Mason City, for appellee.


      Considered by Bower, C.J., and Badding and Langholz, JJ.

**BOWER, Chief Judge.**

Bridget Grady appeals the district court's order on her petition to modify the decree dissolving her marriage to Brett Word, challenging the court's denial of her request for physical care of the parties' child. Upon review, we affirm.

## I.    *Background Facts and Proceedings*

Bridget and Brett married in 2014, and they have two children, born in 2015 and 2017. The parties' marriage was dissolved by an Arizona decree in 2019, several months after the family moved to Iowa. Bridget and Brett stipulated to the terms of the decree, and the court approved their agreement. The agreement provided Bridget and Brett would have joint legal custody of the children, alternating physical care every other weekday and weekend.

In 2022, Bridget filed a petition for modification of physical care in Iowa district court, requesting "primary physical care . . . subject to appropriate visitation by [Brett]." To support her petition, Bridget alleged:

> Some of the substantial change of circumstances include, but are not limited to, a break down in the ability of [Bridget] and [Brett] to communicate and effectively cooperatively co-parent to the degree necessary to maintain shared physical custody, behaviors by [Brett] that adversely impact the emotional and mental health of the children to their detriment, the children are struggling under the terms of the current custody order which is proving unworkable for them and parents, refusal by [Brett] to reasonably cooperate in decision making for the children to the detriment of the children, deterioration in [Brett]'s mental health, etc. [Bridget] is in a superior position to raise the children to successful adulthood and it is in the children's best interests to be in the primary care of [their] mother.

Brett filed an answer, denying Bridget's claims and requesting physical care of the children.

The modification trial took place over three days in March 2023. The district court heard testimony from the parties and a number of other witnesses. The guardian ad litem also filed a detailed report. Both parties had remarried and were living in appropriate and nurturing homes. By all accounts, the children were well-adjusted, happy, and involved in school and activities. A large portion of the evidence was centered on the status of Brett's mental health as a "total permanent disabled veteran." In support of her petition, Bridget pointed to Brett's diagnosis of post-traumatic stress disorder (PTSD), claiming the changes in his mental health and behaviors necessitated modification of physical care.

Ultimately, the district court denied Bridget's request to modify physical care,[1] concluding she had not "shown a substantial change in circumstances by a preponderance of the evidence." Specifically, the court found "Brett's diagnosis appears unchanged from prior to the decree." Accordingly, the court declined to modify the parenting plan. Bridget appeals.

## II.    Standard of Review

"Actions for the modification of a dissolution decree are tried in equity." *In re Marriage of Roberts*, 954 N.W.2d 757, 760 (Iowa Ct. App. 2020). Our scope of review is therefore de novo. Iowa R. App. P. 6.907. "Though we make our own findings of fact, we give weight to the district court's findings." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016).

---

[1] Brett filed a motion to reconsider, enlarge, or amend, relating to child support. The district court entered an order on Brett's motion, providing credit to his child-support obligation for Bridget's receipt of dependent benefits of social security disability. Bridget does not challenge the court's ruling on that issue.

### III.     *Jurisdiction*

Preliminarily, Bridget claims the district court "erred in failing to apply Arizona law" to her petition for modification.  Bridget points to a provision in the parties' 2019 joint parenting plan, which stated in part, "This Agreement shall be construed and enforced in accordance with the laws of the State of Arizona.  The State of Arizona is the 'Home State' of the minor children and was the 'Home State' of the children at the time this action was commenced."  Although Bridget offers no legal support for her specific contention,[2] we take the opportunity to determine whether Iowa had subject matter jurisdiction over this case.  *See In re J.M.*, 832 N.W.2d 713, 719 (Iowa Ct. App. 2013) ("On appeal, we may, and should, examine the grounds for subject matter jurisdiction even though the parties have not.").

To do so, we look to whether the mandatory jurisdictional prerequisites required under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA) were met.[3]  *See In re Marriage of Ross*, 471 N.W.2d 889, 893 (Iowa Ct. App. 1991) (dismissing a petition for modification because Iowa lacked jurisdiction from its inception and therefore could not reach the merits of the case).  Because Arizona made the initial child-custody determination, *see* Iowa Code § 598B.201(1), we examine the prerequisite steps to modification under section 598B.203.  That section, involving jurisdiction to modify a determination, provides:

> Except as otherwise provided in section 598B.204, a court of this state shall not modify a child-custody determination made by a court of another state unless a court of this state has jurisdiction to make

---

[2] As a result, we find that Bridget waived this claim on appeal.  *See* Iowa R. App. P. 6.903(2)(a)(8)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

[3] The UCCJEA is a jurisdictional act that includes, in part, proceedings involving the physical custody and visitation of a child.  Iowa Code § 598B.102(4) (2022).

an initial determination under section 598B.201, subsection 1, paragraph "a" or "b", and either of the following applies:

(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under section 598B.202 or that a court of this state would be a more convenient forum under section 598B.207.

(2) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

*Id.* § 598B.203.

As a preliminary hurdle, section 598B.201(1)(a) requires the court to answer the question of which state is the "home state"[4] of the children. Here, Bridget filed her petition for modification in Cerro Gordo County, maintaining her address was in Rudd and Brett's address was in Mason City. Brett admitted these allegations in his answer. Further, Bridget testified the parties and the children had moved to Iowa in spring 2019, and the parties' dissolution was finalized in July 2019. The dissolution decree was registered in Iowa in September 2021. There is no question Iowa is the "home state" of the children.

Turning to the next question, we find section 598B.203(2) applies here, because the district court determined the children and the parties "do not presently reside in the other state." *See id.* § 598B.203(2); *see also Hullman v. Richards*, No. 20-1302, 2021 WL 2708943, at *2 n.5 (Iowa Ct. App. June 30, 2021) (finding "section 598B.203(2) does not apply here because Bill resides in Missouri"). As

---

[4] Iowa Code section 598B.102(7) defines the "home state" as

the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.

the court found, "Both parties moved to North Iowa prior to the decree being finalized in Arizona. Since moving to Iowa, the parties have continued to share joint legal custody and joint physical care of the two minor children." Because the prerequisites of the UCCJEA are satisfied, we conclude Iowa retains subject matter jurisdiction over this modification proceeding.

## IV.    *Modification of Physical Care*

A party seeking modification of a dissolution decree "faces a heavy burden, because once custody of a child has been fixed, 'it should be disturbed only for the most cogent reasons.'" *In re Marriage of Harris*, 877 N.W.2d at 440 (citation omitted). To justify modification, the movant "must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered." *Id.* "The changed circumstances affecting the welfare of children and justifying modification of a decree 'must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.'" *Id.* (citation omitted). Moreover, the movant "must also prove a superior ability to minister to the needs of the children." *Id.*

Bridget claims "there is no evidence that the Arizona court ever considered or analyzed whether Brett was exhibiting symptoms of his mental illnesses in the original decree." According to Bridget, Brett's symptoms are a substantial change of circumstances warranting modification of the decree and placing the children in her care. As noted, the parties stipulated the terms of their dissolution decree. Bridget's claim on appeal is belied by her testimony:

> Q. Now, I want to talk about the circumstances prior to and at the time of the entry of the decree. A. [BRIDGET] Mm-hmm.

Q. When was the divorce decree entered in your case?
A. 2019.

Q. Prior to 2019, what was Brett's mental health diagnoses?
A. Okay. So do you want me to tell you the diagnosis or kind of the whole story?

Q. Let's start with the diagnosis. A. Okay. So as far as I know, his diagnoses was severe PTSD, paranoia. He had dissociative episodes, depression, anxiety. He had also told me he had been diagnosed with schizophrenia, and I'm not sure if that is accurate or not. And hallucinations.

Q. And so back then he had all of those diagnoses? A. Yes.

Q. And was he deemed totally disabled back then? A. He had been before we got married.

Bridget further testified Brett was "struggling with alcohol dependency" prior to the dissolution and she believed his use of alcohol impacted his mental health. However, Bridget conceded, "I don't think he really drinks much now."

Brett agreed he was struggling with his mental health at the time of the dissolution but stated he "had always stayed plugged into the VA health care system." He completed inpatient treatment "for PTSD" in 2018, "before the divorce." Brett acknowledged he went through a "rough patch" in March 2020, when a ruptured disc in his back "flared up," causing "debilitating pain." But he stated Bridget helped him out during that time and he was still able to be with the children. Brett had back surgery in October 2020, which markedly improved his pain. Related to his mental health, Brett testified he completed cognitive behavioral therapy in 2022 and he was trying other "mindfulness" programs, but he had to "cancel some of them as kids events came up." He described his medications, which he stated "[a]bsolutely" helped his mental health. Brett acknowledged he struggled with paranoia, but he believed Bridget "knows how to get to [him]" by intentionally disrupting routines.

Advanced registered nurse practitioner Sara Wolfe, who had been Brett's primary care provider since he moved to Iowa, reported Brett "has always done all that has been recommended by any of his care providers and asked of him, and he continues to work very hard to continually improve his health." Wolfe noted "Brett has many resources available to him and his family through the VA," he had "always been willing to utilize whatever resources he and his family need," and she had "seen tremendous improvements over the years that [she has] worked with him." Psychotherapist Muriel Hess, who had treated Brett "for about three years," testified he had "made a great deal of progress," opining he was "more highly motived than the average patient, and he's taken on additional therapies." Hess opined Brett was not a danger to the children, and she stated he was "highly motived to pursue whatever is the very best course for his sons." The guardian ad litem reported:

> The undersigned has reviewed medical reports and therapist notes related to father's treatment through the VA. A letter is provided by his psychotherapist, Muriel Hess, and individual therapist, Sara Wolfe. It appears that father regularly engages in sessions with both Ms. Wolfe and Ms. Hess and is cooperative with his treatment team. He appears to engage in a number of therapeutic services such as yoga and mindfulness classes. A number of diagnoses are noted, including PTSD, depression, anxiety, nightmare disorder, hallucinations, and paranoia. It appears that the main diagnosis he is currently being treated for is PTSD. It also appears he has had a past issue with alcohol addiction and has significant physical ailments, such as severe back issues and sleep apnea. Father is prescribed a number of medications, which includes medication to treat paranoia, mood disorder, nightmares, and anxiety. The psychological issues appear to have pre-dated the relationship and would have been in existence at the time of the divorce.

The guardian ad litem was critical, however, of the father's "apparent need to record interactions in a variety of circumstances and have surveillance omnipresent on his property."

The district court addressed these issues as follows in its detailed ruling:

> Prior to the original decree being entered in Arizona, Brett was already diagnosed with PTSD. He also had a great deal of anxiety. He had gone to an extensive inpatient program for treatment in Arizona. At that time, Brett also was drinking to excess. The inpatient treatment program appeared to help. Again, this was in Arizona just prior to the decree.
> . . . .
> In this case, the Court finds that Bridget has not proven by a preponderance of the evidence that there has been substantial change in circumstances since the Arizona decree. The Court believes this conclusion is supported by the following:
> When the decree was entered, Brett appeared to have the same diagnoses and difficulties that he presently has. His condition does not appear worse today, and may be better in some respects. He is being treated through the VA and is on medications. However, this has been the case since before the decree. If anything, it appears that he is as stable now as in the past. He is in a stable relationship with Ashley Word and has been married to her since January of 2021.
> This is not to say that there have been no difficulties in parenting the children for the parties. The parties are in a tense relationship. Both have remarried. It appears to the Court that both parties are stressed by coparenting issues and with the rather frequent exchanges provided for in the original decree. Brett continues to have issues with anxiety, which the Court believes perhaps to have been exacerbated by the modification action. The present state of affairs as described by the parties was certainly "night and day" scenario. A huge amount of the Court's decision is based upon the credibility of the witnesses. The Court was able to observe and hear the witnesses in person and have certain impressions and make certain conclusions. Since the Court's decision relies heavily on the credibility and presentation of the witnesses, the Court will make additional observations:
> Bridget appeared to be very frustrated and fatigued of dealing with Brett. That being said, Brett's mental health challenges are really not new to the case and were present when the decree was entered. The rather frequent exchanges provided for in the decree have given the parties many opportunities to interact with each other and engage in coparenting. This has proven to be stressful over

time. The Court also noted that Bridget has really changed her relationship with Brett over the last couple of years. When Brett was having back trouble, she was very involved and supportive of him and almost was a caretaker. That has since changed, quite rapidly and dramatically. At the time of trial, she was very stressed and worn out of dealing with Brett.

Brett appeared to be a very anxious person to the Court. In the courtroom, he appeared to be quite vigilant and somewhat edgy. That being said, he appeared to be a respectful person and was very focused and attentive. He is very focused and invested in the boys, and their needs and activities and their lives and futures. He did appear to be very conscientious about following his treatment plan. The Court wonders whether the modification action itself caused Brett to become over-vigilant. He received criticism for videotaping, documenting, and reporting concerns regarding the children. When in litigation, people may be advised to document things. There is no doubt that he overdid things in that regard. Unfortunately, pending litigation can have a negative effect, but the videotaping and recording is quite overdone and unnecessary. It certainly does add to the tenseness of the situation.

Muriel Hess is Brett's present therapist. The Court was very impressed with her credibility and knowledge of Brett's case.[5] Ms. Hess had no real reason to be anything but objective in her testimony. She believed that Brett was presently on a good trajectory in terms of his mental health. The testimony of Ms. Hess was almost completely contradictory to the testimony of Bridget. She did not see a large degree of paranoia, but did see anxiety, and did not see schizophrenia in Brett.

. . . .

In summary, as indicated above, the Court does not find that the petitioner has shown a substantial change in circumstances by a preponderance of the evidence. Brett's diagnosis appears unchanged from prior to the decree. Brett is engaged in therapy. Brett's therapist and other witnesses were positive about his status and progress. The parties are stressed and tired of dealing with each other in terms of co-parenting. Brett does continue to struggle with PTSD and anxiety, and he has engaged in over-vigilant and

---

[5] Bridget claims the court "erred in finding Muriel Hess credible . . . because she is gullible and did not think critically about what she was being told by Brett and why." Although we are not bound by the district court's factual findings, we give weight to the court's credibility findings. See Iowa R. App. P. 6.904(3)(g). "There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.'" In re Marriage of Vrban, 359 N.W.2d 420, 423 (Iowa 1984) (citation omitted).

concerning behaviors. Both parties have remarried. The Court is impressed with the stability that Ashley offers to Brett and her good stepparenting abilities. Bridget's attitude toward Brett has recently changed from being quite supportive during his back problems to very frustrated with him presently. Brett did have a period of time with significant back issues and related problems in parenting and he was on pain medication, but that has been cleared up by surgery. And he appears to again be in good health. There was little to no information in the record that the children were being harmed by the present situation. Brett and Ashley are very involved with the children.

. . . .

There [w]as much testimony at trial and the Court is cognizant of Brett's behaviors which have become a source of stress to the petitioner and in coparenting. The Court strongly suggests to Brett that he reevaluate his behavior patterns in the area of coparenting. In denying the petition to modify, however, the Court is also very cognizant of Brett's attention and devotion to parenting. The Court observes in the testimony and exhibits offered that there was little information that the present shared care situation is detrimental to the best interests of the children.

Upon review, we concur in the court's conclusion Bridget failed to carry her burden of proof to establish a substantial change in circumstances. Nearly all the circumstances raised by Bridget were in existence at the time the parties' dissolution decree was entered. There was no reason for the court to disrupt the status quo. Accordingly, we affirm the court's order denying Bridget's petition for modification.

## V.    *Appellate Attorney Fees*

Both parties seek an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Stenzel*, 908 N.W.2d 524, 538 (Iowa Ct. App. 2018) (citation omitted). When considering whether to exercise our discretion we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)

12

(citation omitted). Looking at these factors, we find each party should pay their own appellate attorney fees. Costs of this appeal are assessed to Bridget.

**AFFIRMED.**