IN THE COURT OF APPEALS OF IOWA

No. 23-1257
Filed December 18, 2024

IN RE THE MARRIAGE OF KYLA KAY JENDRO
AND MICHAEL SCOTT JENDRO

Upon the Petition of
KYLA KAY JENDRO, n/k/a KYLA KAY WALTHER,
        Petitioner-Appellee,

And Concerning
MICHAEL SCOTT JENDRO,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Robert B. Hanson,

Judge.


        Michael Jendro appeals economic provisions of the decree dissolving his

marriage to Kyla Walther.  **AFFIRMED.**


        Kelly M. Ramsey of Ramsey Law P.L.C., West Des Moines, for appellant.

        Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des

Moines, for appellee.


        Considered by Badding, P.J., Langholz, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BOWER, Senior Judge.**

Michael Jendro appeals the spousal support and property distribution provisions in the decree dissolving his marriage to Kyla Walther. Finding no failure to do equity between the parties, we affirm. We decline Michael's request for appellate attorney fees but award fees to Kyla.

## I.    *Background Facts and Proceedings*

Michael and Kyla married in 1999. Twenty-three years later, in 2022, Kyla filed a petition for dissolution of marriage. At the time of dissolution, Michael was fifty-six, Kyla was fifty-three, and both were in good health. The parties have three adult children; the youngest of which planned to graduate college in December 2022.

When the parties married, Kyla was a sales representative earning $40,000 per year. In 2000, when their second child was born, the parties decided Kyla would stay home with the children. She did not work full-time again until 2019, when she began a temporary job for the census bureau earning $23.50 per hour. After that position ended, Kyla searched for employment, eventually landing a seasonal job delivering packages for UPS. She then found full-time work as a sales and cabinet designer, but she was let go because she "didn't produce enough sales." The month before trial, Kyla accepted a position as a sales representative for an office equipment company. For the first six months of training, Kyla was to receive a base salary of $55,000. Thereafter, Kyla's base pay would be $42,000 with eligibility to receive monthly commissions.

Michael is a sales representative for a bearing company. His biggest customer is John Deere. His employer pays for his vehicle[1]—including gas for personal use—and his cell phone. Michael's base salary is $132,537.39. He also earns quarterly bonuses and sales bonuses. By the end of September 2022, Michael had earned close to $28,000 in bonuses, placing his minimum income for 2022 at approximately $160,000.

After the parties separated, they sold their marital home for a profit of $180,000. Kyla was renting a bedroom at a friend's house under a temporary arrangement until she found a place of her own. Michael was renting an apartment until the divorce was finalized. Michael requested the parties' respective credit card debts (Michael, approximately $40,000; Kyla, approximately $5000) be paid with the proceeds from the marital home, with the remainder of the home proceeds to be divided equally. Kyla requested $2500 per month in spousal support. Michael agreed he should pay some spousal support but maintained he could only afford to pay $800 per month.

Following trial, the district court entered a decree dividing the marital property. The court ordered the proceeds from the marital home to be divided equally between the parties and each party to be responsible for credit cards debts in their own name. The court awarded Kyla her 401k (valued at $2400) and half of Michael's 401k (valued at $119,800) and IRA (valued at $346,221). For purposes of spousal support, the court determined $55,000 is "an appropriate

---

[1] Starting in March 2023, instead of providing Michael's vehicle, Michael's employer began providing a $600-per-month stipend for Michael to pay for a vehicle of his choice.

estimate of [Kyla's] expected income" and assumed "an annual income of $150,000" for Michael. Based on those numbers and considering the parties' respective needs, the court ordered Michael to pay Kyla $2500 per month until Kyla reached age sixty-four or her death or remarriage. The court also ordered Michael to pay $3000 toward Kyla's attorney fees.

Michael filed a motion to reconsider, enlarge, or amend, which the court denied following a hearing. Michael appeals.

## II. *Standard of Review*

We review dissolution-of-marriage actions de novo. *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021). Upon our review, "we examine the entire record and adjudicate anew the issue of the property distribution." *Id.* (citation omitted). We give weight to the findings of the district court, particularly about the credibility of witnesses, but we are not bound by them. *Id.* The district court is granted considerable latitude, and we will interfere in its rulings in dissolution matters only where there has been "a failure to do equity." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022) (citation omitted).

## III. *Discussion*

Michael challenges the property distribution and spousal support provisions ordered by the district court. "There are no hard and fast rules governing the economic provisions in a dissolution action; each decision depends upon the unique circumstances and facts relevant to each issue." *In re Marriage of Gaer*, 476 N.W.2d 324, 326 (Iowa 1991). Accordingly, we consider Michael's claims while keeping in mind the specifics of this case.

*A.    Property Distribution*

Michael disputes the court's distribution of the parties' credit card debts. Specifically, he claims, "Because the parties were each awarded one-half of the proceeds from the marital home and one-half of all of [his] retirement accounts, the marital debt should be split equally between the parties." Michael further points out "a large portion of [his] credit card debt was due to a tax obligation that the parties incurred from the sale of their rental property several years prior to the parties separating," and "[b]ecause it was marital debt, it should be distributed equitably."

In a dissolution decree, "[t]he court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5) (2022); *see also In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006) ("Iowa is an equitable distribution state."). This division must include the marital debts as well. *See Sullins*, 715 N.W.2d at 251. A court must decide what is equitable "in light of the particular circumstances of the parties" while considering the factors in Iowa Code section 598.21(5). *Id.* at 247 (citation omitted). While an equal division is not always required, "it is generally recognized that equality is often most equitable." *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013) (citation omitted).

Michael testified he used his credit cards to pay for attorney fees, "property tax, bills, and vacations" for the parties and their family. Specifically, Michael stated he incurred a large portion of the debt when the parties "sold a rental house"

in 2018 or 2019 and there were "unanticipated or capital gains tax."[2] He also testified he incurred a portion of debt to cover their adult son's medical bills, to which Kyla did not agree they should do. In his personal monthly expenses, Michael listed $1100 in credit card fees. But Michael conceded he "would get half of the proceeds from the home" and he "could pay off that debt," which would greatly reduce his monthly expenses. He also agreed he has "a better financial ability than Kyla does to meet [his] monthly expenses, even if [he] cho[se] not to use that money to pay off that debt."

Kyla testified she incurred her credit card balance of approximately $5200 to pay for living expenses after the parties' separation because she was receiving only minimal support from Michael.[3] She stated she also incurred a portion of the debt to pay for "some" of her attorney fees. Kyla acknowledged Michael accumulated "substantial" credit card debt during the marriage, but she felt it should be set aside to him because Michael never told her about the debts or that they were used to pay for "income tax or property tax." According to Kyla, Michael "took out those credit cards in his name only. I did not even know he had five credit cards." Kyla also believed Michael had a greater ability to pay off his debts. In her personal monthly expenses, Kyla listed $100 for "revolving debt payments," which

---

[2] We observe Michael provided no further evidentiary support for his explanation of the debt being incurred to pay for taxes, so it is unclear whether the debt was incurred for marital expenses. *But see In re Marriage of Bell*, No. 23-0540, 2024 WL 4039415, at *3 (Iowa Ct. App. Sept. 4, 2024) (noting the evidence supported a finding the parties "used many of [the wife's] credit cards for their marital living expenses").

[3] Michael did not dispute this testimony.

was less than the minimum payment on her credit card.[4]  Finally, relating to the parties' retirement accounts, Kyla testified hers is "very minimal and the transferring of it isn't worth that."  Michael conceded the parties agreed to split his retirement accounts.

On this issue, the district court found:

> Each party shall be solely responsible for any and all debts incurred in his/her name and shall hold the other party harmless therefrom. While the court understands this results in Michael assuming a larger portion of the martial debt, given the disparity in the parties' incomes and Michael's greater ability to rebuild his retirement following the parties' divorce, the court concludes it is appropriate for Michael to assume a greater portion of the marital debt.

We find no reason to disturb the court's order.  Upon our review, we are not persuaded by Michael's contention that equity requires his requested change.  We affirm on this issue.

B. *Spousal Support*

Michael challenges the amount of spousal support awarded by the district court.  Although he acknowledges an award of support is equitable, he asks us to reduce it to $1500 for the same duration ordered by the court.  To support his contention, Michael states Kyla's income "should have been calculated at $60,000," rather than $55,000, and his income "should have been calculated at approximately $140,000," rather than $160,287.

"An award of traditional spousal support is equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she

---

[4] Michael acknowledged Kyla's "minimum payment is $129," whereas the "minimum payment on [his] Chase card is $256" but he paid $600 per month toward that card.

became accustomed." *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023); *accord In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015). "Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Gust*, 858 N.W.2d at 410–11.

In awarding traditional alimony, the amount and duration "is primarily predicated on need and ability." *Id.* at 411 (citation omitted). "In determining need, we focus on the earning capability of the spouses, not necessarily on actual income." *Id.* As for the "ability to pay, we have noted that '[f]ollowing a marriage of long duration, we have affirmed awards both of alimony and substantially equal property distribution, especially where the disparity in earning capacity has been great.'" *Id.* (citation omitted). "Ideally, the support should be fixed so the continuation of both parties' standard of living can continue, if possible." *In re Marriage of Stenzel*, 908 N.W.2d 524, 534 (Iowa Ct. App. 2018).

With respect to Kyla's income, Michael introduced an evaluation by vocational expert Julie Svec, who opined it was reasonable for Kyla to earn approximately $60,000 per year and "be provided a full benefits package." We note, however, Kyla declined to participate in Svec's evaluation. And Michael acknowledged Svec's report contained several errors relating to Kyla's employability and prospective employers. Kyla testified after the first six months of her new job, her salary "goes down to $42,000," and the only way for her to earn more is with commissions. She acknowledged it was possible she could make more than $55,000 per year with commissions, but "[i]t's possible that I make less

than $55,000 as well." Based on this record, we conclude $55,000 is an accurate, if not ambitious, reflection of Kyla's expected income.

Next, we observe that although the court found Michael had earned, "at a minimum," $160,287.35 in 2022 based on his income from January through October, the court "assum[ed] an annual income of $150,000" for Michael. At trial, Michael agreed he was "on track to earn over $160,000" in 2022. But he stated $160,000 would "probably [be] high" if his bonuses were lower. Kyla estimated Michael's income to be "160 plus" when his commissions and bonuses were included. And that estimate did not account for Michael's monthly car stipend of $600 ($7200 per year) as well as expenses for gas and cell phone covered by his employer. We conclude the court's findings with respect to Michael's expected income was well within the range of the evidence presented.

We also observe Michael's personal monthly expenses listed several costs that were either inaccurate or unnecessary. As the court observed, many items listed on Michael's monthly expenses related to voluntary payments toward the parties' adult children's expenses, large payments to his credit card debt, or generous contributions toward retirement. For example, Michael listed $211 for "telephone," which he explained paid for cell phones for Kyla and their daughter. However, Kyla testified she paid for the daughter's cell phone on her plan. Michael agreed his list was "a little outdated" because he no longer had an expense for phones. Similarly, Michael listed $1225 for their daughter's rent and tuition but agreed she would be graduating college in December 2022, so it was "possible" those expenses would no longer exist. Michael also acknowledged he was saving more than ten times the amount per month toward retirement than Kyla.

In sum, we concur with the district court that many of Michael's estimated expenses were inflated whereas Kyla's were "modest" and "conservative." Although Michael claims he does not have the ability to pay the amount ordered by the court, he has significantly higher earning capacity than Kyla, received half the equity of the marital home, and has substantial monthly savings established for retirement. We find no reason to disturb the court's award. *See Sokol*, 985 N.W.2d at 182 ("The institutional deference afforded the district court in determining spousal support counsels against undue tinkering with spousal support awards."). We affirm on this issue.

*C.     Attorney Fees*

Both Michael and Kyla request an award of appellate attorney fees, and each have submitted an affidavit of attorney fees to support their request. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Our "controlling considerations" are the parties' financial positions, but we also consider "whether a party has been obliged to defend the trial court's decision on appeal." *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). Although the parties both have some amount of financial resources to pay their respective attorney fees, Michael's income is more than double Kyla's income. Kyla is also the prevailing party and was forced to defend this action. *See id.* Under these circumstances, it is appropriate to award Kyla appellate attorney fees in the amount of $2000. Costs are assessed to Michael.

**AFFIRMED.**