# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0842
Filed March 11, 2026

———————————

**In re the Marriage of Christopher Zachary Darville
and Jennifer Norma Darville**

Upon the Petition of
**Christopher Zachary Darville,**
Petitioner–Appellant,

And Concerning
**Jennifer Norma Darville n/k/a Jennifer Duffy,**
Respondent–Appellee.

———————————

Appeal from the Iowa District Court for Linn County,
The Honorable Ian K. Thornhill, Judge.

———————————

**AFFIRMED ON APPEAL; WRIT SUSTAINED AND REMANDED**

———————————

Thomas J. Viner (argued) of Viner Law Firm, P.C., Cedar Rapids,
attorney for appellant.

Rachel R. McCrate (argued) of Gray, Stefani, & Mitvalsky, P.L.C., Cedar
Rapids, attorney for appellee.

———————————

Heard at oral argument
by Tabor, C.J., and Badding and Langholz, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

Chris Darville appeals from the decree dissolving his marriage to Jennifer Darville (n/k/a Jennifer Duffy) and the order finding him in contempt of court for violating a temporary injunction. He challenges the denial of joint physical care of the parties' minor child, seeks to lower his child support obligation, contests the monetary penalty imposed as punishment for his contempt, and objects to the court's assessment of Jennifer's trial attorney fees. Treating Chris's appeal of the contempt sanction as a petition for writ of certiorari, we sustain the writ and remand for further proceedings. On all other issues, we affirm.

## I.      Background Facts and Proceedings

Chris and Jennifer were married in 2014. They lived in Texas at the time, and both worked in the information technology field. The couple soon welcomed their only daughter, A.M.D., who spent her first five months in the hospital due to her pre-term birth and related complications. They later settled medical malpractice allegations for a "substantial amount of money," much of which went to hospital bills.[1] A.M.D. continues to have special needs affecting her learning, growth, and development.

Both parents have maintained successful careers. At the time of trial, Jennifer held a management position at an aerospace company, where she earned $195,000 per year. She also works part-time as a high school track coach, for which she is paid an additional $3,000. Chris has full-time information technology positions with three companies, each of which pays him a sizeable salary. He reports a total income of $594,000.

---

[1] The residue of the settlement funded a trust for A.M.D.'s benefit, which is worth about $300,000 today.

According to Chris, the parties' marriage began to deteriorate in Texas due to the stress of A.M.D.'s hospitalization and disputes with Chris's ex-wife. Things only got worse when the family moved to Cedar Rapids in 2019. Over the next few years, Chris began drinking and isolating himself. Jennifer claims she shouldered almost all parenting duties during this time, while Chris asserts he was denied the opportunity to be more involved. He moved out in December 2022 and filed for divorce four months later.

In September 2023, a temporary matters order placed A.M.D. in Jennifer's temporary physical care, with visitation for Chris on Tuesday nights and every other weekend. The court also entered a temporary injunction governing the parties' finances after Jennifer raised concerns about Chris's spending habits. The parties cooperated under their temporary physical care arrangement. But disputes about money continued. In November 2024, Jennifer filed an application for rule to show cause, alleging Chris had routinely violated the court's injunction against dissipation of marital funds—including by spending "exorbitant amounts on pornography and women."

A contempt hearing was consolidated with the dissolution trial, which took place in February 2025. The parties agreed to maintain joint legal custody of A.M.D., and they stipulated to most property matters. Physical care and child support remained disputed issues. After two days of evidence, the court entered a decree that rejected Chris's request for joint physical care, placed A.M.D. with Jennifer, and established a $4,000 monthly child support obligation. It also found Chris in contempt for more than 120 prohibited transactions, for which it ordered him to pay a $24,941 penalty to Jennifer. Attorney fees were taxed to Chris. He now appeals.

## II.    Standard of Review

Dissolution cases are equitable proceedings, so appellate review is de novo.  *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021).  Although we are not bound by the district court's findings, they are entitled to weight.  *Id.*  This is especially true when the outcome of a dissolution turns on the credibility of witnesses.  *In re Marriage of Meester*, ____ N.W.3d ____ , 2026 WL 44638, at *3 (Iowa Ct. App. 2026) (noting the "front-row seat to the parties' testimonies greatly helps the [district] court in making a wise decision about the parties and their children" (cleaned up)).  Contempt orders, however, are reviewed for the correction of errors at law.[2]  *In re Marriage of Swan*, 526 N.W.2d 320, 327 (Iowa 1995).

## III.   Analysis

### A.    Physical Care

Chris asked the district court to place A.M.D. in the parties' joint physical care with an every-other-week schedule.  The court rejected that option because of the couple's "significant differences in parenting philosophies" and their "inability to effectively communicate." Left with the difficult choice between two loving parents, it placed A.M.D. in her mother's physical care, observing Jennifer "has been the child's primary caretaker throughout the child's life."  The court found that Chris, by contrast, had sometimes prioritized other things, "not to the point of placing the child in

---

[2] An order to punish for contempt typically must be challenged by writ of certiorari.  *Rausch v. Rausch*, 314 N.W.2d 172, 173 (Iowa Ct. App. 1981); *see also* Iowa Code § 665.11 (2024).  But a defect in the form of the appeal does not prevent this court from reaching the merits.  Iowa R. App. P.  6.151(1).  Thus, on the issue of contempt, we will treat Chris's notice of appeal as a petition for writ of certiorari.

danger, but certainly to a point that does not always serve the child's best interests."

On appeal, Chris challenges the district court's physical care decision. He argues that his history of shared caregiving with Jennifer and their low degree of conflict weigh against the court's reasoning and in favor of joint physical care. We disagree.

To determine whether a parent's request for joint physical care is appropriate, we look to the factors set out in Iowa Code section 598.41(3) (2025), as well as other facts and circumstances outlined in case law. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (citing *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)). Key considerations include:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (citing *Hansen*, 733 N.W.2d at 697–99). A child's best interests are the ultimate focus of the physical care analysis, and the court must strive to impose a care arrangement that promotes their physical health, mental health, and social maturity. *Hansen*, 733 N.W.2d at 695–96. With these principles in mind, we agree with the district court that joint physical care is not in A.M.D.'s best interests.

While Chris contends that he "has always been involved" in A.M.D.'s physical care, the record shows otherwise. *See id.* (stating that in determining physical care, courts "tend to favor a spouse who, prior to divorce, was primarily responsible" for the child's care). There is no dispute that Jennifer

was A.M.D.'s primary caretaker when she was an infant, but Chris contends he assumed that role in the child's toddler years—from around 2016 to 2019. During that period, Jennifer commuted while Chris worked from home. A nanny cared for A.M.D. from eight o'clock in the morning to three o'clock in the afternoon. Chris took over for a few hours after that—"entertaining her, keeping her fed, [and] keeping her diapers changed"—until Jennifer returned from work. Although Jennifer disputes Chris's account of his involvement, both parties agree the arrangement he alleges did not continue for long. Chris admits that he became "withdrawn from the family" when they moved to Iowa in 2019. For the next three years, he would spend most of his time in the family's basement, assisting Jennifer with few if any parental duties.

Chris's involvement improved after the parties separated in December 2022—but not immediately. Jennifer testified that after Chris moved out, he did not see A.M.D. until February 2023, when he started picking her up "one night a week for a couple of hours after school." Chris did not have any overnights with A.M.D. until the temporary order that September. Even then, Jennifer testified that she remained the parent responsible for coordinating A.M.D.'s appointments, attending extracurriculars, and generally "know[ing] what's going on." *See Meester*, 2026 WL 44638, at *4 (finding the approximation principle favored the mother where, although the father "was not an idle parent," she "handled most of the routine tasks for their child"). Although Chris contends that he was "relegated to a secondary role" under the temporary order, Jennifer presented spreadsheets showing that Chris failed to participate in many of A.M.D.'s appointments and activities, as well as some visits.

Chris's attitude toward A.M.D.'s schedule is a fundamental barrier to joint physical care. During the dissolution case, the child was involved in

martial arts, dance, scouts, horseback riding, and choir. She also received occupational therapy, physical therapy, speech therapy, play therapy, and tutoring. Jennifer testified that parental involvement in A.M.D.'s therapies is particularly important because "seeing what the therapist does with [A.M.D.] you can replicate that at home." But Chris thinks A.M.D. receives more help than she needs and that her busy schedule leaves no time "to just be a kid." *See Hansen*, 733 N.W.2d at 699 ("[I]n order for joint physical care to work, the parents must generally be operating from the same page on a wide variety of routine matters.").

Even assuming Chris is right, a child's calendar is never empty. Given his lack of participation during the dissolution process, we are skeptical whether he can support even a more modest parental routine. Not only did he avoid A.M.D.'s extracurriculars, but he rarely went to her therapy appointments, testifying they were "during [his] work hours" and it was "challenging to find enough time to leave." When asked how he would handle an alternating week schedule, Chris said that he would "find a way to make it work" and that he has "the flexibility to attempt to rearrange meetings." But Chris was working three full-time jobs at trial, which Jennifer said consumed "quite a few hours" of his week. And courts hesitate to take a child from their primary caretaker in favor of a spouse whose parental availability is limited by their work. *See, e.g.*, *In re Marriage of Dunkerson*, 485 N.W.2d 483, 485 (Iowa Ct. App. 1992); *In re Marriage of Muell*, 408 N.W.2d 774, 777 (Iowa Ct. App. 1987).

Jennifer also emphasizes Chris's vices, suggesting we should question his fitness as a caregiver due to his history of alcohol abuse, his alleged experimentation with drugs, and his expensive pornography habit. While Chris conceded that he drank more than he should have during the late stages

8

of the marriage, there is no evidence that he has struggled with alcohol or drugs since the parties' separation. He did, however, spend considerable money on pornography and other adult activities throughout the dissolution proceedings. Chris admitted that he paid women on the internet "probably a couple thousand a month" to create custom adult content. He also paid for in-person encounters with female companions. Jennifer points out that some of these transactions took place on days when A.M.D. was in Chris's care.

There is nothing to suggest that Chris's habits have ever harmed or affected A.M.D., so we do not give them the controlling weight Jennifer urges. *See Denson v. Capps*, No. 20-0774, 2021 WL 3075740, at *3 n.5 (Iowa Ct. App. July 21, 2021) (giving little weight to a mother's use of an online chat application for compensation where there was no evidence it occurred in the child's presence or affected her ability to care for the child); *In re Marriage of Grandinetti*, 342 N.W.2d 876, 879 (Iowa Ct. App. 1983) ("While moral misconduct is a factor to be accorded weight in a child custody determination, it has been weighed most heavily only in those cases where the misconduct occurred in the presence of the children."). Still, we may consider a parent's addictive behaviors when deciding what physical care arrangement is in the child's best interests. *See* Iowa Code § 598.41(3)(a) (requiring the court to consider "[w]hether each parent would be a suitable custodian for the child"); *Meester*, 2026 WL 44638, at *4 (finding a father's excessive drinking weighed against joint physical care, despite his proactive efforts to arrange for the child's care during binges). And the record is clear that Chris often overindulges, as shown by the evidence documenting his pornography consumption. A mental health evaluation also confirms his problems with impulsiveness.

Against this evidence, Chris argues the district court wrongly found that he and Jennifer showed an "inability to effectively communicate." We agree this is not a case where the degree of conflict makes joint physical care an obvious impossibility—although the parties have a wide difference in opinion when it comes to the child's needs. *Cf. Hensch v. Mysak*, 902 N.W.2d 822, 826 (Iowa Ct. App. 2017) (noting that "tension between the parents is not alone sufficient to demonstrate a shared-chare arrangement will not work"). But the other considerations discussed above tip the balance, especially Jennifer's clear role as A.M.D.'s primary caretaker. *See Hansen*, 733 N.W.2d at 698 ("[W]here one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases.").

Considering the total setting presented by this family, we decline to disturb the district court's physical care determination. *See In re Marriage of Ford*, 563 N.W.2d 629, 631 (Iowa 1997) ("In assessing a custody order, we give considerable weight to the judgment of the district court, which has had the benefit of hearing and observing the parties first-hand.").

## B. Child Support

In a post-trial order, the district court directed the parties to submit child support guideline calculations using a gross annual income of $594,000 for Chris and $198,000 for Jennifer. The court adopted Chris's guidelines worksheet, which set the parties' combined net income at $43,964 per month. That income level generated a basic support obligation of $2,845— the highest amount for a single child under the then-effective guidelines. *See* Iowa Ct. R. 9.26 (2025) (providing basic support obligations for monthly

incomes up to $25,000).[3]  After adjustments for health insurance and taxes, Chris asked for his monthly child support obligation to be set at $1,996.  The court accepted that figure from Chris's guidelines worksheet but granted Jennifer's requested "upward departure" to $4,000 per month.

In explaining its award, the district court noted "the guideline calculations do not adequately consider the level of income each party earns." It also noted that Jennifer was required to pay all of A.M.D.'s private school tuition under other provisions of the decree.  Beyond this, the court found increased child support was warranted "in lieu of an additional financial award to [Jennifer] to account for the dissipation of marital assets."

Chris contends the district court's departure from his proposed calculation of $1,996 per month "does not tie child support to income in any way."  He also argues that the $4,000 award improperly punishes him for wasting marital assets without a specific dissipation finding.  Chris asks for a remand on this issue so that the court can impose an obligation "based on findings related to income."

Both parties suggest the child support award should be reviewed under the rebuttable-presumption framework described in Iowa Court Rules 9.4 and 9.11.  That framework presumes "the amount of child support which would result from the application of the guidelines is correct," Iowa Ct. R. 9.4, and prevents courts from varying from that amount "without a written finding that the guidelines would be unjust or inappropriate" under the

---

[3] Since the trial, the guidelines have been expanded to include combined net monthly incomes up to $30,000.  *See* Iowa Ct. R. 9.26 (2026).  "On our de novo review, . . . we are obliged to apply the most current guidelines."  *In re Marriage of Bolick*, 539 N.W.2d 357, 360 (Iowa 1995).  The basic support obligation for combined net monthly incomes of $30,000 is now $3,509 for one child.

criteria set out in rule 9.11. This rebuttable presumption was mandated by federal legislation from the 1980s. *See* Laura Raatjes, *High-Income Child Support Guidelines: Harmonizing the Need for Limits with the Best Interests of the Child*, 86 Chi.-Kent L. Rev. 317, 321 (2011). The legislation "was intended to remedy the inadequate, inconsistent, and ineffective case by case approach for setting child support" under the discretionary approach that had been employed by many states before then—Iowa included. *In re Marriage of Powell*, 474 N.W.2d 531, 533 (Iowa 1991); *see also* Raatjes, 86 Chi.-Kent L. Rev. at 321.

But in high-income cases, our state's guidelines return the court to that discretionary approach. Rule 9.26 states that when the parents' combined monthly incomes exceed the limits of the schedule, it is "within the sound discretion of the court" to determine a basic obligation equal to or greater than the scheduled maximum. Iowa Ct. R. 9.26(3). Within that discretionary range, courts may consider the statutory factors that were applied before adoption of the guidelines. *See Powell*, 474 N.W.2d at 534 (stating the statutory factors "may be considered when the guidelines require judicial discretion"); *accord In re Marriage of Maher*, 596 N.W.2d 561, 565 (Iowa 1999). Those factors include: "the financial resources of the child; the financial resources of both parents; the standard of living the child would have enjoyed had there not been a dissolution; the cost of day care; the physical and emotional health needs of the child; and the child's educational needs." *In re Marriage of Campbell*, 451 N.W.2d 192, 194 (Iowa Ct. App. 1989) (citing Iowa Code § 598.21(4) (1988)); *see also* Charles J. Meyer, Justin W. Soulen & Ellen Goldberg Weiner, *Child Support Determinations in High Income Families—A Survey of the Fifty States*, 28 J. Am. Acad. Matrim. Laws. 483, 500 (2016) (noting a "standard core of factors" considered by many states include "the needs of the child in excess of the amount allotted for

support; the pre-divorce standard of living enjoyed by the child and parents; and the best interests of the parties").

Viewed through this lens, Chris's argument that his child support obligation "is not tied to income" fails on its starting premise. Because the parties' combined salaries surpass the upper limits of the guidelines schedule, the district court was not constrained by the guideline amount—except as a floor for its award. Instead, the court was permitted to exercise its discretion based on the factors outlined above. Here, the court's award was based on two primary justifications: A.M.D.'s future education expenses and Chris's dissipation of assets.

The district court's first justification is proper. The record shows that A.M.D.'s special needs require expensive learning interventions. And under the decree, she will continue to attend private school at Jennifer's expense. According to Jennifer's financial affidavit, the total cost of A.M.D.'s tutoring, tuition, and therapy is around $1,500 per month. The court was allowed to account for the parties' historic investment in A.M.D.'s education—and Jennifer's future obligation—when crafting its support award. *See Powell*, 474 N.W.2d at 534 (noting a child support award may be designed to "reflect the standard of living the child would have enjoyed had there not been a dissolution"); *In re Marriage of Beeh*, 214 N.W.2d 170, 173 (Iowa 1974) (finding the district court appropriately considered parochial school tuition expenses in establishing child support).

As for the court's other justification—offsetting dissipation—Chris is correct that this was not an appropriate factor. Dissipation is a backwards-looking issue relevant to property distribution. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007); *see also In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009) (explaining property distribution is "designed to

sort out property interests acquired in the past"). Child support serves a separate, prospective purpose. *See* Iowa Ct. R. 9.3 (stating child support recognizes "the duty of both parents to provide adequate support for their children"); *In re Marriage of Peterson*, 227 N.W.2d 139, 142 (Iowa 1975) (noting "allocations of support money, alimony and property have a different purpose" and must be separately decided). Iowa courts have sometimes found distribution and support to be intertwined, but only where a parent's marital property award is relevant to determining their earning capacity. *See In re Marriage of Blume*, 473 N.W.2d 629, 633 (Iowa Ct. App. 1991); *In re Marriage of Mead*, 429 N.W.2d 564, 565 (Iowa Ct. App. 1988). Jennifer cites no authority suggesting a child support award may be used to supplement an otherwise-inequitable property division.

We accordingly disregard the dissipation factor on our de novo review of the record. *See In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005) (noting that because our review is de novo, we may make our own findings and conclusions); *see also Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968) (noting that on de novo review, we "draw such conclusions . . . as we deem proper"). Having done so, we conclude $4,000 per month was a reasonable and necessary amount to support A.M.D., considering the parties' financial resources, the child's special needs and educational interventions, and the standard of living she would have enjoyed had there not been a dissolution. *See Powell*, 474 N.W.2d at 534; *In re Marriage of Huh*, No. 15-1598, 2016 WL 7403725, at *8 (Iowa Ct. App. Dec. 21, 2016).

## C.    Contempt Sanction

When discovery revealed Chris's extensive spending on pornography and women, Jennifer asked the court for an injunction, arguing Chris was dissipating marital assets. In September 2023, the district court entered an

14

order prohibiting the parties from "contracting with any third party for any sexual acts or companionship" and from "pay[ing] for pornography or for anything that violates the laws of the state of Iowa."

Chris acknowledges that despite this order, he continued to spend money on custom sexual content. Bank statements admitted at trial show he sent approximately 120 payments to out-of-state women between January and December 2024. When asked about these transactions, Chris claimed that he believed the court's injunction allowed him to "buy porn, just not illegal porn." The district court rejected that explanation, finding Chris in contempt for spending "a total of $24,941.29 to make purchases specifically prohibited by the injunction." As a sanction, it ordered Chris to pay the same amount to Jennifer. It explained that half of this penalty would reimburse Jennifer for her share of the dissipated funds. The other half would punish Chris for his "willful violation of the Court's Order."

Chris challenges the $24,941 sanction.[4] He argues the court lacked any basis to "require a 50% repayment and then a 50% penalty," which he likens to "paying twice." Chris conceded in his brief and again at oral argument that a monetary sanction was "within the *authority* of the court"

---

[4] Chris's appellate brief also suggests the court "erred in finding Chris in contempt," but we struggle to discern what part of that finding he challenges. While we could consider this issue waived, *see* Iowa R. App. P. 6.903(2)(a)(8)(3), we have reviewed the contempt finding on its merits and find no legal error. There is substantial evidence from which the court could conclude beyond a reasonable doubt that Chris violated the injunction. *See Rater v. Iowa Dist. Ct.*, 548 N.W.2d 588, 590 (Iowa Ct. App. 1996). He admitted as much at trial. To the extent Chris maintains he mistakenly interpreted the injunction, we defer to the court's refusal to credit that excuse. *See McKinley v. Iowa Dist. Ct.*, 542 N.W.2d 822, 825 (Iowa 1996).

to impose. He challenges only the extent of that penalty, arguing $24,941 was "not a fair assessment."

Despite Chris's concession, we must decide the question of authority. *See Wilson v. Fenton*, 312 N.W.2d 524, 529 (Iowa 1981) (explaining a void contempt sanction cannot be permitted to stand "even when a party does not raise the issue"). "An Iowa court's contempt power is inherent, but the power to punish may be validly limited by statute." *Christensen v. Iowa Dist. Ct.*, 578 N.W.2d 675, 679 (Iowa 1998). In dissolution cases, "section 598.23 defines the potential sanctions." *Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 709 (Iowa 1986); *accord Skinner v. Ruigh*, 351 N.W.2d 182, 184 (Iowa 1984). One punishment available under that statute is commitment "to the county jail for a period of time not to exceed thirty days for each offense." Iowa Code § 598.23(1). "[A]s an alternative to punishment for contempt," the court may enter "an order which, according to the subject matter of the order or decree involved," does any of the following:

> a. Withholds income under the terms and conditions of chapter 252D.
>
> b. Modifies visitation to compensate for lost visitation time or establishes joint custody for the child or transfers custody.
>
> c. Directs the parties to provide contact with the child through a neutral party or neutral site or center.
>
> d. Imposes sanctions or specific requirements or orders the parties to participate in mediation to enforce the joint custody provisions of the decree.

*Id.* § 598.23(2).

The district court cited section 598.23 as the basis for its monetary penalty. But the statute does not authorize that punishment. According to Jennifer, section 598.23(2)(d) comes closest. While that paragraph permits

the court to fashion unspecific "sanctions" upon a finding of contempt, they must be limited to a particular purpose: "enforc[ing] the joint custody provisions of [a] decree." *Id.* § 598.23(2)(d). We have declined to read paragraph (2)(d) as a license to impose a discretionary penalty in any situation. *See, e.g.*, *Terry v. Iowa Dist. Ct.*, No. 17-0959, 2018 WL 3471836, at *5 (Iowa Ct. App. July 18, 2018) (finding section 598.23(2)(d) did not authorize the court to mandate therapy as a sanction for spouse's failure to satisfy attorney-fee obligation); *In re Marriage of Herbers*, No. 13–0668, 2014 WL 955292, at *6 (Iowa Ct. App. Mar. 12, 2014) (finding none of the alternatives in section 598.23(2) authorized the court to order payment of attorney fees as a punishment for contempt). Such a broad construction would effectively remove all guardrails from a statute that is supposed to "regulat[e] the court's contempt power." *Christensen*, 578 N.W.2d at 680.

District courts do have the ability to compel payment of an obligation as a condition to purge contempt—provided that the condition is imposed in connection with a jail sentence. *See Ary v. Iowa Dist. Ct.*, 735 N.W.2d 621, 627 (Iowa 2007) (explaining a "court's power to order a person committed to the county jail for a period of time includes the power to withhold commitment conditioned on compliance with a prescribed condition"). That's not what happened here. The court imposed an independent monetary penalty, explaining that Jennifer could seek a jail sentence as a "further contempt sanction" if Chris failed to comply. In other words, Chris's payment to Jennifer was a punishment on its own, not a remedy to avoid punishment. *See Christensen*, 578 N.W.2d at 680 (declining to treat unauthorized "courtroom incarceration" as a condition to purge where the purpose of the sanction was punitive and not remedial).

17

The district court's $24,941 sanction resembles the monetary penalties available under our general contempt statute. *See* Iowa Code § 665.4(2) (permitting the court to impose "a fine not exceeding five hundred dollars" as an alternative to imprisonment); *Wilson*, 312 N.W.2d at 529 (noting fines under section 665.4 "can be levied retrospectively for separate acts of contempt"). But we need not address whether that separate statute applies in this dissolution context. Even if it did, section 665.4 would not allow the district court to impose a fine that is payable to another party. *See French v. Iowa Dist. Ct.*, 546 N.W.2d 911, 914 (Iowa 1996) ("Punishment, not damages, is the primary aim of a contempt proceeding under Iowa Code chapter 665."); Iowa Code § 666.3 (stating court fines "shall be paid to the treasurer of state for deposit in the general fund of the state").

Because the district court lacked statutory authority to order payment of $24,941 to Jennifer as a sanction for Chris's contempt, we sustain the writ of certiorari with respect to that void penalty and remand for the court to impose a punishment permitted by statute. *See Wilson*, 312 N.W.2d at 529–30.

### D. Trial Attorney Fees

The district court ordered Chris to reimburse Jennifer $4,808 in fees for the contempt action, as well as a $25,000 share of her total legal bill for the dissolution. Chris challenges only the latter award on appeal, arguing the fee-shift "punishes [him] in every way requested by Jennifer and goes beyond what he can afford to pay."

An award of trial attorney fees "rests within the court's broad discretion." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). "The test is whether the fee is reasonable and based on the parties' respective

18

abilities to pay." *Id.* There is no dispute about the reasonableness of the fees requested by Jennifer, and Chris's higher income supports the award. We accordingly find no abuse of the court's discretion.

### E.  Appellate Attorney Fees

Jennifer also requests appellate attorney fees. Those fees "are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Stenzel*, 908 N.W.2d 524, 538 (Iowa Ct. App. 2018) (citation omitted). "Factors to be considered in determining whether to award attorney fees include: the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up). Considering these factors, we deny Jennifer's request.

**AFFIRMED ON APPEAL; WRIT SUSTAINED AND REMANDED.**